# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| Jane Doe 202a, | ) | C/A No.: 2:16-cv-00530-RMG-MGB |
| | ) | |
| Plaintiff, | ) | Jury Trial Demanded |
| | ) | |
| v. | ) | Deprivation of Civil Rights |
| | ) |    Excessive Force: Detainee Assault |
| Al Cannon, Sheriff of Charleston County, | ) |    Excessive Force: Taser Use |
| individually and in his official capacity, | ) |    Excessive Force: Restraints |
| Deputy Kathryn Farmer, 10486, individually | ) | Conspiracy under 42 USC 1983 |
| Deputy Thomasina Dyer, 9795, individually, | ) | Failure to Train under 42 USC § 1983 |
| Deputy Andrew T. Grant, 8940, individually, | ) | Gross Negligence under state law |
| Deputy Lindsay Fickett, 10448, individually, | ) | Supervisory Liability |
| Deputy Brandon Calvert, 9941, individually, | ) | Declaratory Relief |
| DFC E. Sanders, 10285, individually, | ) | Injunctive Relief |
| Deputy Patrice Washington, 10099, individually, | ) | Defamation |
| Deputy Tracey Matthewes, 9530, individually, | ) | |
| Deputy Lieutenant Steven Durbin, 8920, | ) | |
| individually, | ) | |
| Deputy B. Key, individually, | ) | |
| Deputy Captain M. Tice, individually, | ) | |
| Chief Deputy Willis L. Beatty, individually, | ) | |
| Christopher McLauchlan, 10599, individually, | ) | |
| Michael A. Walters, 10176, individually, | ) | |
| Sandra J. Senn, | ) | |
| Senn Legal, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## Complaint

For her Complaint, Plaintiff Jane Doe 202a alleges:

### Parties, Jurisdiction, and Venue

1.    Jane Doe 202a, referred to in this Complaint as Jane Doe, is an adult citizen and resident of South Carolina. She is referred to by pseudonym because in November, 2012, she returned to South Carolina to assist her mother, a vulnerable adult with what is now known to be

a debilitating and terminal medical condition.  Her mother's identity and privacy are protected from the public record by an existing South Carolina circuit court order, and by the provisions of S.C. Code § 43-35-60, which maintains as confidential information about vulnerable adults in need of protection.

2.    The identity of the Plaintiff will be disclosed to Defendants upon their written consent to protect Jane Doe's identity from the public record by redacting from the public record both the identity of Jane Doe and information from which her identity can be derived, such as her name, her mother's name, addresses, and names of family members.  Alternatively, if the Defendants object to the Plaintiff complying with that existing circuit court order and state statute, and will provide to Plaintiff's counsel a writing stating their objection to pseudonym use, then the Plaintiff will submit a motion seeking an order for leave to proceed by pseudonym.

3.    Al Cannon is the present Sheriff of Charleston County and a resident and citizen of South Carolina.  He is referred to in this Complaint as the Sheriff when sued in his official capacity, and as Cannon when sued in his individual capacity.  The Sheriff is a state official, operating under color of state law.  S.C. Const. Art. V, § 24 establishes the office of the sheriff, the term of the office, and charges the General Assembly to provide by law for his duties and compensation.  One such statutory duty of the Sheriff is to operate the Charleston County Detention Center.  That duty carries with it the obligation to comply with the United States and South Carolina Constitutions, and to train his deputies to do the same.

4.    The Sheriff's deputies are each also regarded as a state official operating under color of state law.  Each serves at the pleasure of the Sheriff.

5.    The office of the Sheriff is funded by Charleston County.

6.    The Sheriff is sued both individually for damages and, for injunctive and declaratory relief, in his official capacity.

7.    In each of his individual and his official capacity, the Sheriff as a matter of state law has direct responsibility for, and liability for, the conduct of his deputies, as opposed to responsibility for employees through *respondeat superior*.  In this Complaint, the allegations against the Sheriff for the conduct of his deputies are not based on *respondeat superior* or other vicarious liability under 42 U.S.C. § 1983, but derive from the Sheriff's direct responsibility imposed on him by state law for the conduct of his deputies.  In addition, the Sheriff has independent 1983 liability individually for his own failures to properly train deputies, for his deliberate indifference to the practice at the jail for his deputies to disregard policy and operate in a manner that ignores rather than protects civil rights for (a) access to counsel, (b) retaliation for demanding access to counsel, (c) prohibitions against retaliatory uses of force, and (d) prohibitions against excessive force.

8.    By operation of state law, the individual allegations against deputies in their individual capacities under 42 U.S.C. § 1983 also allege the liability of the Sheriff, as a result not of vicarious liability under 42 U.S.C. § 1983 but by operation of state law.

9.    During the time period covered by this Complaint, the Sheriff employed as deputies working at the detention center Kathryn Farmer (employee 10486), Thomasina Dyer (employee 9795), Andrew T. Grant (8940), Lindsay Fickett (employee 10448), Brandon Calvert (employee 9941), DFC E. Sanders (employee 10285), Patrice Washington (employee 10099), Tracey Matthewes (employee 9530), Lieutenant Steven Durbin (employee 8920), Deputy Key, Captain M. Tice, and Chief Deputy Willis L. Beatty.  Each is a citizen and resident of South Carolina, and each is sued individually under federal law, other than Patrice Washington, who is sued

individually under state law contingent on her actions being outside the scope of protections otherwise afforded her by the Tort Claims Act.

10.    Sandra J. Senn is a private citizen and resident of South Carolina doing business in South Carolina.  Pertinent to this Complaint, she engaged in conduct defamatory *per se* of the Plaintiff, and did so in at least two of three possible capacities: unquestionably as a representative of Senn Legal, LLC, which is also a private entity; then also either individually or as a representative of one or more of her clients.  If Sandra J. Senn contends, and one or more clients agrees, that her defamatory *per se* conduct of the Plaintiff was taken on behalf of a client, and is the client's conduct as a result, among the possible clients responsible for her conduct are the Sheriff; and any of the Sheriff's deputies.

11.    Senn Legal, LLC, is a domestic for-profit limited liability company organized and existing under the laws of South Carolina that at all times pertinent to this Complaint had (and has) its principal place of business in Charleston county, and did (and does) business in South Carolina.  It is a private entity and its agent for service of process is Sandra J. Senn.

12.    At all times pertinent to this complaint, Senn Legal, LLC acted through its principals, agents, and employees, one of whom was (and is) Sandra J. Senn.  At all times pertinent to this Complaint, Senn Legal, LLC had a duty to supervise its principals, agents and employees so they complied with state law.  Sandra Senn, as a principal in Senn Legal, LLC, had a generalized duty to put into place systematic measures to help prevent tortious conduct, including her own.

13.    In this Complaint, Defendants Sandra J. Senn and Senn Legal, LLC, are referred to collectively as the "Senn defendants" unless otherwise particularly specified.

4

14.    Only one recovery is sought for the tortious conduct by the Senn defendants, once Sandra J. Senn clarifies the capacity in which she engaged in defamation of the Plaintiff, and whether she asserts her own tortious behavior is the responsibility of someone other than herself through her conduct as the agent of other persons or entities.

15.    The Court has personal jurisdiction over the parties to this action.

16.    The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(3), in that federal questions and matters involving civil rights and injunctive relief are alleged.  The Court has supplemental and pendent jurisdiction over the state law claims alleged.

17.    Venue in the Charleston Division is proper under 28 U.S.C. § 1391(b)(1) and b(2), in that the action has been brought where the events occurred and where the Defendants reside.

18.    This is an action under state and federal law for money damages and injunctive relief.  It is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1986 and 1988, the First, Sixth and Fourteenth Amendments to the Constitution of the United States, and under the Constitution and laws of South Carolina.

**Nature of Wrongdoing**

19.    In March, 2014, about 10:30 p.m., Jane Doe was awakened from being asleep in her bed at her home with a flashlight in her face and someone demanding to know if she needed medical care and how much had she had to drink?  Unknown to Jane Doe, the stranger was a police officer who, with others, had broken into her house without a warrant and without proper justification.  That (and other) conduct is the subject of separate litigation.

20.    Jane Doe ordered the stranger to leave her bedroom and her home.  Because she did that, Jane Doe was wrongfully arrested and wrongfully charged with violating a North

Charleston city ordinance of assaulting a police officer, a false and wrongful charge, but the charge against her after police broke into her house.

21.    Jane Doe was taken to the Charleston County Detention Center (referred to in this Complaint as the jail), where she was transferred to the custody of the Sheriff with that inflammatory charge against her.

22.    According to jail documents, Jane Doe was accepted into the Sheriff's custody at 10:45 p.m., 22:45 as it is expressed in the 24-hour timekeeping method used at the jail.

23.    Jane Doe's status at the jail was that of a pre-trial detainee, referred to in this Complaint as a detainee.

24.    Jane Doe is 5'8" tall and weighs 110 pounds.

25.    Almost immediately after Jane Doe was placed in custody of the Sheriff with the inflammatory charge of assault on a police officer, the arresting officer changed the charge against Jane Doe to the less inflammatory, but still false, charge of simple assault.  Documents which reflected the change in the charge were not given to the jail.  That arresting officer had accomplished her purpose to retaliate against Jane Doe by placing her at the jail with the inflammatory charge the arresting officer knew was false, knew would be inflammatory to jail deputies, and knew had been "provoked" by Jane Doe having ordered police officers out of her house (as she had every right to do) after their late night warrantless entry.  Those corrupt acts by police are the subject of other litigation.  The reaction to the charge at the jail, and other misconduct, is the subject of this litigation.

26.    The Sheriff's policy and practice at the jail, and used as to Jane Doe, is to retaliate against a detainee charged with assaulting an officer by depriving that detainee of her rights.  Alternatively, the Sheriff's policy and practice is to retaliate against anyone who requests their

rights, including their right to counsel, or both.  In this Complaint, a reference to retaliation refers to either, or both, of those retaliatory motivations.

27.    The "danger" Jane Doe posed to the jail when she demanded her right to call counsel was that if she was permitted to communicate with counsel, she might not spend a hellish night in the jail.  To prevent that, each of the deputies named in this complaint conspired to deprive Jane Doe of her rights, using the various techniques set out below to do so.

28.    Jane Doe would eventually be told by a deputy from the day shift, after the deputies had succeeded in imposing on Jane Doe the hellish night she went through at the jail as set out below, that "when you are charged with assaulting an officer, you get no rights." The deputy overtly voiced the Sheriff's apparent policy, practice or custom, and the conspiracy Jane Doe encountered, to deprive Jane Doe of her rights so as to retaliate against her, and any detainee, because she was charged with assaulting an officer.

29.    The false assault charge against Jane Doe was *nol prossed*, dismissed, and has been expunged.  The purpose of the charge was to expose Jane Doe to a hellish night in jail.

30.    Al Cannon operates the jail, and does so with either intentional disregard for, or deliberate indifference to, protecting constitutional rights, despite his legal education.  His deputies, including those serving as reviewers of behaviors of subordinate deputies, are apparently not trained on fundamental aspects of constitutional protections, do not follow the Sheriff's own policy restrictions which supposedly protect civil rights, and do nothing to enforce the polices which supposedly apply to, among other things, the right to counsel, right of a detainee to be informed of the charges against him or her, and the prohibitions against, respectively, a deputy's use of excessive force, a deputy's assault on a detainee, a detainee's

7

right not to be retaliated against for asserting her rights, improper use of a Taser, and improper use of restraints.

31.     In addition, or alternatively, Jane Doe was deprived of her rights and got such treatment from deputies and reviewers due to the Sheriff's custom, policy, and practice that if a detainee is charged with assault on a police office, that detainee gets no rights and deputies are permitted to mistreat the detainee.

32.     The Sheriff preserved no video related to Jane Doe from her jail admission at 22:45 to 23:19, the first 34 minutes of Jane Doe's detention.  The Sheriff destroyed approximately 94% of the video record of Jane Doe's 17 hours and 15 minutes in the jail, preserving less than 68 minutes of video.

33.     At the jail, Jane Doe was handcuffed, seated in a chair in the strip cell, and was causing no disturbance other than asking why she had been arrested and to make phone calls, particularly to her lawyer.

34.     **Conspiracy technique 1: seek conflict by impeding meaningful access to counsel**.  Jane Doe had a right under the First, Sixth, and Fourteenth Amendments to the United States Constitution to have meaningful access to counsel as part of her meaningful access to the courts.  She also desired to make a phone call to get help for her mother, who had been abandoned when Jane Doe was taken to the jail.

35.     The first illicit tactic in the conspiracy under 42 U.S.C. § 1983 to deprive Jane Doe of her rights was that each of Farmer, Dyer and Fickett refused to permit Jane Doe meaningful access to her lawyer and to let her call to get help for her mother and for herself.

36.     From 22:45 to 23:19, Jane Doe demanded to call her lawyer, as jail policies provide she has a right to do.  Her right to call her counsel was denied, first by Farmer and Dyer,

then by Fickett, then by the Special Operations Group (SOG) team, then upheld by those who reviewed the conduct of Farmer, Dyer and Fickett.

37.    Had Jane Doe been permitted to call a lawyer (or anyone else), she could have communicated her mother's need for assistance as well as consulted about the charge against her.

38.    Farmer and Dyer placed Jane Doe in a chair in the strip cell, her hands cuffed behind her back. Jane Doe demanded to communicate with counsel.

39.    State minimum standards and jail policies entitled her to call counsel. Jane Doe was not permitted to call counsel. Fickett has testified that the jail policy that entitled a detainee to call counsel did not reflect the practice at the jail. The practice at the jail is to routinely impede meaningful access to counsel, so as to impede a detainee's meaningful access to the courts.

40.    Within seconds of Jane Doe stating to Fickett her demand to call counsel, Fickett retaliated against Jane Doe by assaulting her, as set out below and as shown by the documents at Attachment A.

**41.    Conspiracy techniques 2 and 3: seek conflict by falsely demanding a strip search, then deny doing so**.  The second and third illicit tactics in the conspiracy to deprive Jane Doe of her rights was Farmer and Dyer demanding of Jane Doe a strip search, which Farmer and Dyer each then lied about having done so.

42.    Jane Doe was searched before being placed into the police car for transport to the jail. She was then searched upon arriving at the jail at 22:45.

43.    Immediately thereafter, a strip search was demanded of Jane Doe. There was no proper rationale to support a strip search, as there was no reasonable basis to suspect Jane Doe

had on her person either a weapon or contraband.   The demand was made because of the charge against her.

44.    State minimum jail standards prohibit strip searches except as a "safety and/or security measure."  Farmer and Dyer, and then Fickett, each violated the state minimum standard, and Jane Doe's rights, in demanding a strip search.

45.    Jail policy did not permit a strip search against Jane Doe, and jail policy entitled her to communicate by phone with counsel.

46.    Farmer and Dyer (and later Fickett) each later claimed, falsely, that Jane Doe was impeded in her right to call counsel because she had refused a mere demand that she change from her own clothes to a jail uniform.  Even that rationale is not a proper rationale on which to deny a detainee her First and Sixth Amendment rights.

47.    In fact, it was a strip search demanded of Jane Doe upon her entry to the jail.  To retaliate against Jane Doe, Farmer and Dyer sought a conflict with Jane Doe, to justify using excessive force against Jane Doe.

48.    The small portion of the objective video record that was not destroyed shows (a) that Jane Doe was seated in the strip cell, barefoot, with her hands cuffed behind her back (b) there was nowhere in the room a uniform into which she could change, (c) Dyer and Farmer were wearing surgical style gloves, as one would wear in a strip search, and (d) at no point were Jane Doe's handcuffs removed.

49.    The demand for a strip search violated jail policy, state minimum standards, and Jane Doe's Due Process rights.

50.    **Conspiracy technique 4: seek conflict by refusing to tell Jane Doe why she had been arrested**. By 23:19 that night, some 34 minutes after she arrived at the jail, Jane Doe had

still not been told the charge against her.  She had repeatedly asked, but no one would tell her, why she had been arrested.  She had repeatedly informed deputies, but no one would listen, that her mother was alone and she needed to make a telephone call. She also repeatedly asked to talk with her lawyer.

51.     Under state law Jane Doe was entitled to be told the actual charge against her.  The refusal to inform her violated state law and her Due Process rights.

52.     **Conspiracy technique 5: seek conflict by giving Jane Doe a false reason for her arrest**.  Deputy Dyer would tell Jane Doe only that her mother had had her arrested for Jane Doe abusing her mother, a contention that was in fact false, and defamatory *per se* since her mother is a vulnerable adult who is rapidly losing her capabilities due to Alzheimer's disease.  It is the subject of other litigation on behalf of the mother that police removed Jane Doe and left her mother to fend for herself, after police were told that her mother had dementia and that she could not care for herself.

53.     Jail officials prevented Jane Doe from being able to get help for her mother by depriving her of her right to make a telephone call to counsel or anyone else.

54.     Deputy Dyer published the false information about Jane Doe to other deputies and to other detainees.  Deputy Washington was among those who repeated Dyer's false information, and herself published it to other deputies and other detainees in that portion of the jail known as 1A.

55.     Deputy Dyer knew or should have known that it was a lie to tell Jane Doe that Jane Doe's mother had caused her arrest for abusing her, and knew or should have known it accused Jane Doe of a felony under state law, was defamatory *per se*, and breached her duty under state law to inform Jane Doe of the charge against her.

56.    Jane Doe knew she had not mistreated her mother, and kept demanding to know the actual reason she had been arrested, which she was entitled to know.  No part of the charge against her had anything to do with Jane Doe's mother.

57.    Refusing for 34 minutes to comply with state law that a person be informed of the charge against her, and in that time telling a detainee only false allegations (and information selected specifically to be upsetting), was a tactic used by Dyer to create conflict with Jane Doe by frustrating Jane Doe so as to provoke her.

58.    Dyer knew, or should have known, of the actual charge against Jane Doe.  Dyer violated state law and Jane Doe's Due Process rights by giving Jane Doe false information about her charge, and defamed Jane Doe by publishing to other deputies and detainees' false and defamatory information about the charge against Jane Doe.

59.    **Conspiracy techniques 6 and 7: seek conflict by assaulting Jane Doe, then use spoliation to try to hide the assault but preserve the reaction**.

60.    Jane Doe was neither being disruptive nor was she giving Dyer or Farmer a basis to claim she was being disruptive.

61.    A custom, policy and practice of the Sheriff and his deputies is to provoke a detainee (as was done with Jane Doe) so that selectively preserved video could use her reaction to the provocation to distort her conduct during confinement.

62.    Jail policies state that if a detainee is being "uncooperative," that the detainee is to be placed in a holding cell.  Jail policies do not authorize, as they could not lawfully do so, a unilateral punishment for detainees that without Due Process infringed a protected right.

63.    Jane Doe demanding to call a lawyer was not a proper basis on which to consider Jane Doe being "uncooperative," yet the jail's practice is to consider a request to call counsel as

a detainee being "uncooperative." Alternatively, Jane Doe was retaliated against because of the charge against her.

64. Because other techniques had not worked to provoke Jane Doe in the first 34 minutes of her detention, Farmer and Dyer summoned the SOG team to retaliate against Jane Doe for demanding a telephone call to which she was entitled, and then Dyer used excessive force against Jane Doe by ordering the SOG team to transfer Jane Doe to disciplinary segregation without Due Process, and by ordering Jane Doe confined to the "ERC," the Emergency Restraint Chair, also without Due Process.

65. Each of Dyer's retaliatory "punishments" of Jane Doe is considered a "major" act of discipline under the state's minimum jail standards. "Major" discipline cannot be imposed without Due Process, including not less than 24 hours notice and a hearing.

66. The Sheriff has been deliberately indifferent to training Dyer, Farmer, Fickett, Walters, McLauchlan and Calvert that any "major" discipline (as defined by the state) must have proper Due Process protections before it can be implemented. Dyer, Farmer, Fickett, Walters, McLauchlan and Calvert each ignored Due Process for Jane Doe in implementing Dyer's directive to retaliate against Jane Doe.

67. When the SOG team arrived, by agreement among Farmer, Dyer, and the SOG team, Fickett was sent into the strip cell with Jane Doe. Farmer then came in to watch, and through the doorway, each of Dyer, Walters, McLauchlan and Calvert also watched or could hear Fickett's interaction.

68. In the first 45 seconds of Fickett's interacting with Jane Doe, Jane Doe again demanded of Fickett that Jane Doe be permitted to call her attorney; immediately in response, Fickett assaulted Jane Doe.

69.    Fickett's assault of Jane Doe was in front of deputies Farmer, Dyer, Walters, McLauchlan and Calvert.

70.    Fickett's assault violated Jane Doe's rights under the First, Sixth, and Fourteenth Amendments to the United States Constitution.

71.    The assault by Fickett of Jane Doe is plainly reflected in 15 pages of screen shots, which constitute Attachment A to this Complaint.  They are taken from the video inadvertently not destroyed of Fickett's assault.

72.    At 23:19:21, page 1 of Attachment A, Farmer is shown in the doorway of the strip cell and Fickett inside the strip cell.  Jane Doe is entirely obscured by the curtain.

73.    At 23:19:23, page 2 of Attachment A, Fickett can be seen walking behind the curtain.  Her interaction with Jane Doe is about to begin.

74.    At 23:19:39, page 3 of Attachment A, Farmer can be seen to enter the strip cell.

75.    At 23:19:40, page 4 of Attachment A, Farmer can be seen reaching for the curtain, which until then had obscured her view of Jane Doe and the assault Fickett was about to make.

76.    At 23:19:41, page 5 of Attachment A, Farmer can be seen to have moved the curtain, revealing part of Jane Doe, who is seated, her hands handcuffed behind her, causing no disturbance other than demanding to call her lawyer.

77.    At 23:19:51, page 6 of Attachment A, Fickett can be seen to have moved to her right, mostly behind the curtain.  Jane Doe remained seated and handcuffed, causing no disturbance other than demanding to call her attorney.  At 23:19:55, Jane Doe stated to Fickett, "I am calling my attorney.  Right now."

78.    At 23:20:03, shown on page 7 of Attachment A, Jane Doe was handcuffed and seated, causing no disturbance other than having demanded that Fickett permit her to call her

lawyer.  Fickett stood before Jane Doe, Farmer was in the room and Dyer was in the doorway of the strip cell reaching her hand to Farmer.

79.    By 23:20:06, page 8 of Attachment A, Jane Doe remained handcuffed and seated, causing no disturbance other than demanding to call her lawyer; Farmer was in the room and Dyer was in the doorway; Fickett had been interacting with Jane Doe for 43 seconds, entirely in ordinary conversational tones.  It had been 11 seconds since Jane Doe demanded to call her lawyer.

80.    At 23:20:07, page 9 of Attachment A, based on no "disturbance" from Jane Doe other than her demand to call her lawyer 12 seconds earlier, Fickett's black-gloved hand can be seen on Jane Doe's throat, beginning the assault on her by strangulation. Farmer remained in the room and Dyer remained in the doorway.

81.    At 23:20:08, page 10 of Attachment A, Fickett can be seen continuing the assault of Jane Doe, with her hand on Jane Doe's throat and Jane Doe screaming in response.  Farmer remained in the room and Dyer remained in the doorway.

82.    At 23:20:09, page 11 of Attachment A, Fickett's strangulation of Jane Doe continued.  Farmer remained in the room and Dyer remained in the doorway.

83.    At 23:20:10, page 12 of Attachment A, Fickett's strangulation of Jane Doe continued but was partially obscured by the movement of Jane Doe's struggle against the strangulation as she moved to her left, camera right, more behind the curtain.  Farmer remained in the room and Dyer remained in the doorway.

84.    At 23:20:11, page 13 of Attachment A, Fickett's strangulation of Jane Doe continued, partially obscured by the strip cell curtain.  Farmer remained in the room and Dyer remained in the doorway.

85.    At 23:20:15, page 14 of Attachment A, Fickett's hand is still on Jane Doe's throat. Farmer remained in the room and Dyer remained in the doorway.

86.    At 23:20:19, page 15 of Attachment, having completed her assault, Fickett can be seen moving the curtain of the strip cell to fully reveal Jane Doe to the camera.  Farmer remained in the room and Dyer remained in the doorway.

87.    Fickett's assault on Jane Doe was provoked by nothing other than Jane Doe's demand to call her lawyer.  There was no "situation" that needed to be "controlled" by any use of force.  No immediate threat of any serious physical harm was presented.  Before the assault by Fickett, Jane Doe remained handcuffed, seated in a chair, and was doing nothing but talking in normal conversational tones, demanding to talk with her lawyer.

88.    The use of force by Fickett threatened the blood flow to Jane Doe's brain and the airflow to her lungs.  The strangulation constituted "deadly force" as defined in jail policy in that strangling someone is "likely to cause death or serious physical injury."

89.    Fickett strangled or choked Jane Doe for about eight seconds, until Jane Doe twisted away from her.  Jane Doe's voice rose to an inarticulate guttural scream as Fickett was strangling her, which was audible to Fickett, Farmer, Dyer, Walters, Calvert and McLauchlan, as well as the other deputies in the processing area.

90.    Fickett strangled and choked Jane Doe in full view of deputies Farmer and Dyer, and within earshot (for Jane Doe's scream) of deputies Michel Walters, Brandon Calvert, Christopher McLauchlan, and others.

91.    Dyer told Fickett, in Jane Doe's presence, to "keep that one out of sight," referring to either (or both) of putting Jane Doe in the jail where she could not be located by anyone making inquiry after Jane Doe, or advising Fickett to make sure that neither she nor any of the

SOG team preserved any video of Fickett's assault on Jane Doe when Jane Doe demanded to speak to her lawyer.

92.    The shoulder camera video has better sound quality than do the room cameras, which is why all four of the SOG team destroyed their shoulder camera video of the Fickett assault.

93.    Jane Doe is entitled to a spoliation instruction that had the SOG team not destroyed their shoulder camera video of the Fickett assault, Fickett would be shown to have assaulted Jane Doe in response to demanding to exercise her right to call her attorney, and within sight and hearing of Farmer, Dyer, Walters, McLauchlan, Calvert, and other deputies.

94.    Fickett filed no Use of Force report about her strangling Jane Doe. Fickett violated jail policy in not filing a Use of Force report.

95.    The Sheriff's spoliation practice was disclosed when, three minutes later, in video Fickett did preserve from her shoulder camera, Jane Doe complained to Fickett, that she was "being mishandled" by Fickett. To which Fickett responded, "I haven't touched you, I haven't touched you," an overt falsehood by Fickett designed to create a false video record, since Fickett knew she and her SOG team would delete the video of the strangulation, and expected all video of it to be destroyed.

96.    Had the spoliation program worked as planned, the video record would have retained only Fickett's claim that Jane Doe had not been touched and none of the video of Fickett strangling Jane Doe. Fickett's lie that Jane Doe hadn't been touched was to have been, and was, preserved. The shoulder camera video of Fickett's assault on Jane Doe was to have been, and was, destroyed.

97.    Fickett destroyed her own shoulder camera video of her assault on Jane Doe, and (by agreement) Walters, Calvert, and McLauchlan each did the same.

98.    Judging by the inaction of those who observed it, assault on a detainee is apparently a routine practice at the jail, either affirmatively condoned by the Sheriff, tolerated by the Sheriff, or reflecting (a) the Sheriff's deliberate disregard for training deputies that detainees are not to be assaulted, or (b) that detainee's charged with assault on a police officer are to be mistreated, or both.

99.    The assault on Jane Doe provoked her, as the deputies intended.  As part of the Sheriff's systematic spoliation, video of Jane Doe's reaction was preserved so her behavior could be distorted.

100.    After Fickett's assault, for 12 seconds Jane Doe shouted her demand to know why she had been arrested, that she wanted to call a lawyer, and that she wanted Deputy Chief Coyle Kinard to be called so her mother could get assistance

101.    Jane Doe had previously said, "I want Coyle Kinard.  I want Coyle Kinard in my house," meaning she desired someone to get a message to North Charleston Police Deputy Chief Coyle Kinard that Jane Doe had been arrested and would Deputy Chief Kinard go to her house? Kinard had long known her family, was aware that her mother had deficits from dementia, and Jane Doe knew he would be able to get help for her mother.

102.    Jane Doe reasoned that if the jail deputies would not let her make any of the phone calls to which she was entitled, perhaps the jail deputies would pass on a message to another law enforcement person, who the deputies might know or regard as a peer.

103.    The Defendants refused each request by Jane Doe.  No communication was made to Coyle Kinard.

104.   No video from Fickett, Walters, Calvert, or McLauchlan was included in the FOIA request for all video related to Jane Doe, and a representation was made that as to Jane Doe, all retained video had been produced.

105.   The Sheriff claims all video from the jail's ceiling cameras is retained for 45 days, after which it is selectively destroyed.  The Sheriff uses a spoliation practice in destroying video, to eliminate evidence of deputy misconduct and detainee abuse, and to distort detainee conduct so as to justify depriving detainees of rights, as was done with Jane Doe.

106.   The Sheriff has the capability to save video for three years plus 120 days (the limitations and service period).

107.   Each SOG operator, on each shift, records video from his or her shoulder-mounted camera.

108.   SOG operators and the jail have the capability to retain all SOG operator video.

109.   To further the Sheriff's practice of spoliation, and to conceal deputy misconduct, SOG operators deliberately delete video at the end of each shift.

110.   Spoliation of the video record by the Sheriff is a deliberate custom, policy or practice to accomplish the illicit objective of concealing retaliation against a detainee charged with assault on a police officer; alternatively, to conceal all detainee mistreatment.

111.   The Sheriff's practice of spoliation concealed mistreatment of Jane Doe and, upon information and belief, is used routinely to conceal mistreatment of detainees.

112.   In this instance, in the 94% of Jane Doe video destroyed by spoliation, video evidence was destroyed of (a) refusing to inform Jane Doe of her actual charge (as Farmer and Dyer did), (b) lying to Jane Doe about her charge (as Dyer and Washington did), (c) later abuses by other deputies, including the assault on Jane Doe by Fickett  (witnessed by Dyer, Farmer,

Walters, Calvert, McLauchlan, and others), (d) the context of a detainee's conduct, so it could be distorted as, for example, her being "intoxicated" (when she was not at all intoxicated) or "yelling and cursing and demeaning to everyone," and (e) Jane Doe being taunted by SOG operators and deputies in 1A, particularly Deputy Washington.

113.    The only "danger" to the jail if Jane Doe had been allowed to call a lawyer, was that Jane Doe might have meaningful access to counsel and might not have had the hellish night in jail that the deputies aspired to impose on her.  As revealed to Jane Doe the following morning by a day shift deputy, the Sheriff's custom, policy and practice was (and is) that she was to be given no rights because she was charged with assaulting an officer.   Alternatively, the jail deprives all detainees of their rights.

114.    Despite her right to do so, Jane Doe was not permitted to telephone counsel, and was retaliated against for asking to call counsel.

115.    Solely to frustrate her Constitutional rights, it would be more than 14 hours before the jail would permit Jane Doe to make any phone call.  During that time, Jane Doe's mother was alone back at Jane Doe's home, and could neither feed nor toilet herself.  As noted above, the police who arrested Jane Doe ignored warnings about her mother's incapacity when Jane Doe was removed from her home, conduct that is the subject of other litigation brought by those holding power of attorney for the mother.

116.    Jane Doe informed the jail defendants that her mother needed help.  Rather than permit Jane Doe the phone calls to which she was entitled, Farmer, Dyer and Fickett calculated that Jane Doe's concern for her mother might eventually cause Jane Doe to get angry.  Their objective was to create conflict so as to provoke Jane Doe.

117.    The Sixth Amendment to the United States Constitution required that Jane Doe have meaningful access to counsel.  The First Amendment assured Jane Doe of her right to communicate with family after a detention.  Through the Fourteenth Amendment, Jane Doe had a right to Due Process before her rights are infringed.

118.    State minimum jail standards require access to telephones for any detainee in the intake process, require telephone access be explained to a detainee, and prohibit restricting a detainee's telephone access without "legitimate government interests related to the safe and secure operations of the facility."  Those provisions applied to Jane Doe.

119.    Jail policies (a) protect a detainee's right to make "at least two" phone calls in the intake process, specifically to enable a detainee to consult counsel and to inform family, (b) direct that detainees "are assisted, as needed, to notify persons of their incarceration," (c) make phones available to detainees 24 hours a day, (d) permit a detainee to question the conditions of her confinement (e) direct that legal issues about a detention "must be clearly resolved prior to admission" and (f) authorize regular hours of 8 a.m. to 11:30 p.m. for access to counsel, with other times by request.  Jane Doe was still within the normal visiting hours for attorneys when she requested to call counsel, and the jail policies protected her right to a call.

120.    The jail policies create a protected liberty interest in use of the telephone protecting rights secured by the First Amendment (for a call to family), and Sixth Amendment (for call to counsel), through the Due Process protections of the Fourteenth Amendment for each, as well as meaningful access to the courts.

121.    Fickett testified that the regular practice at the jail is to routinely ignore the policies as to a detainee's telephone access as Jane Doe demanded.

122.   No legitimate security reason justified refusing Jane Doe telephone access to counsel.  Knowing her mother could not be alone for too many hours, a call to someone was imperative to protect the health and safety of her mother.  Jail deputies ignored Jane Doe's interest in protecting her mother, and her interest in communicating with counsel.

123.   After Fickett's assault, Jane Doe had to try to comprehend what was happening to her.  Without cause, police had broken into her home and assaulted her in her bedroom, and now she had been assaulted by jail deputy Fickett while Jane Doe was handcuffed and causing no disturbance other than demanding to call her lawyer, and the deputy who assaulted her was falsely claiming that Jane Doe had not been touched.

124.   By discarding the video which showed Fickett strangling Jane Doe, combined with (a) the agreement of deputies Farmer, Dyer, Walters, Calvert and McLauchlan to not report Fickett's strangling Jane Doe and (b) Fickett's false, but preserved claim that Jane Doe had not been touched, the Sheriff and his deputies were using the Sheriff's spoliation practice to falsify the record of Jane Doe's incarceration.

125.   Fickett had no problem putting hands on Jane Doe to strangle her while she was handcuffed, to later move Jane Doe to a regular wheelchair, or to later move her into the ERC, each time after Jane Doe demanded to call her lawyer.

126.   Later, when Fickett desired to use a Taser against Jane Doe, Fickett would say she wanted to "stay away" from Jane Doe as her justification for the Taser use, even though when Tased, Jane Doe was already strapped into the ERC by left arm, both legs, waist, and shoulders, and posed no possible threat of danger to Fickett or anyone else.

127.   Farmer filed no use of force report about Fickett strangling Jane Doe.  Farmer violated jail policy in not filing a use of force report.

128.   Dyer filed no use of force report about Fickett strangling Jane Doe.  Dyer violated jail policy in not filing a use of force report.

129.   None of SOG operators Michel Walters, Brandon Calvert, or Christopher McLauchlan filed a use of force report about Fickett strangling Jane Doe.  Neither did any of them preserve their own shoulder camera video of Fickett strangling Jane Doe.  Each violated jail policy in not doing so.

130.   The first shoulder camera video preserved by Walters started at 23:22:06, after Fickett strangled Jane Doe.

131.   The first shoulder camera video preserved by Fickett started at 23:25:37, after she had strangled Jane Doe.

132.   McLauchlan and Calvert preserved no shoulder camera video at all.

133.   Alternatively, strangling a detainee is in the normal course for jail operations so is not regarded as even a use of force, let alone a use of deadly force, despite jail policies to the contrary.  The practice, policy or custom of the Sheriff to operate the jail in a manner that permits deputies to disregard jail policy reflects his deliberate indifference to proper training.

134.   After Fickett's strangulation, Jane Doe tried to defend herself from further assault by Fickett.  Jane Doe again asked if she could have an attorney and why she was in the jail. Fickett told her she was "noncompliant," as if either being charged with assault on a police officer alone, or asking for an attorney by itself, is sufficient to be considered "noncompliant."

135.   Jane Doe then raised her voice for 12 seconds, repeating her demands to know (in succession) why she was in jail, where was her attorney, and where was North Charleston Police Department Deputy Chief Coyle Kinard that is the reaction the deputies desired to get.

Thereafter, Jane Doe's behavior at the jail was falsely characterized by only those 12 seconds not her other more than 17 hours at the jail.

136.    **Conspiracy techniques 8 and 9: claim her 12 second outburst was the entirety of Jane Doe's behavior, and claim it was itself "noncompliance" to justify improper administrative segregation**.  These techniques were used by the deputies and by Sandra J. Senn for the Senn Defendants (and on whoever else's behalf that Sandra J. Senn acted in a representative capacity).

137.    After her 12 second reaction to Fickett's assault, Defendants referred to only those 12 seconds to describe her conduct.  For example the Senn Defendants defamed Jane Doe to third persons that Jane Doe in the restraint chair was, "yelling and cursing and demeaning to everyone," an untruthful statement, and defamatory. There was no "yelling" from Jane Doe in the restraint chair, as the Senn Defendants were well aware.

138.    The unprivileged commentary published by the Senn Defendants to third parties was defamatory of Jane Doe, and was intended to deliberately distort what had happened at the jail in order to disparage Jane Doe.  The same technique was used by all other Defendants.

139.    As noted above, Dyer apparently directed that video of the Fickett strangulation should be discarded ("keep that one out of sight"), and Fickett indeed discarded her shoulder cam video of the strangling, as did each of her SOG team members, preserving only Fickett's known falsehood that she had not touched Jane Doe. When the Senn Defendants published their disparagement of Jane Doe, they knew or should have known that spoliation had been used selectively to destroy the video record so as to distort it.  It is not yet known if the Senn Defendants are part of the spoliation process.

24

140.    The deliberate distortion of Jane Doe's experience at the jail by Dyer, and by creating a false video record, and conduct by Farmer, Fickett, Walters, Calvert, McLauchlan, and the Senn Defendants, violated Jane Doe's Constitutional rights to Due Process.

141.    Selectively destroying video of Fickett strangling Jane Doe, then publishing to third parties false statements about her behavior (as did the Senn Defendants), which relied on the spoliation, reflects a meeting of minds and overt acts to further a conspiracy to deprive Jane Doe of her Constitutional rights.

142.    Fickett would later testify, consistent with the plan to distort Jane Doe's behavior, that Jane Doe was "very excitable, very loud, verbal.  She tried to talk over you, would yell over you, scream.  You know, noncompliant.  She would resist us."  This is the way (a) the Sheriff's spoliation practice was used to distort Jane Doe's behavior, and (b) shows how the jail deputies set up a detainee for retaliation by excessive force through almost-but-not-quite-concealed provocations such as Fickett's strangling.

143.    Of the roughly 17 hours and 15 minutes Jane Doe was in the jail, Fickett's testimony fairly describes only Jane Doe's 12 second verbal outburst after Fickett strangled her. Even during those 12 seconds Jane Doe presented no physical disruption beyond her defensive movement to avoid Fickett's strangulation. The Defendants provoked Jane Doe so as to get a reaction, to use that reaction to retaliate against her as they desired and to present her in a false light.

144.    Fickett gave other blatantly false testimony of Jane Doe's conduct as part of the plan with other deputies, reviewing deputies, and the Senn Defendants, to affirmatively misrepresent Jane Doe's conduct to justify having used excessive force against Jane Doe.

145.   The defendants, including the Senn defendants, retaliated against Jane Doe, either for the charge against her or for her demanding to exercise her rights, or both. The jail defendants retaliated against her at the jail through excessive force.  The Senn Defendants retaliated after Jane Doe had left the jail, to further the distortion of Jane Doe's conduct to inhibit Jane Doe exercising her rights and to try to intimidate Jane Doe.

146.   The overt acts taken to further that meeting of the minds included planning to provoke Jane Doe by having Fickett strangle her (Fickett, Farmer, and Dyer); attempting to conceal the Fickett strangling from the camera (Fickett, Farmer and Dyer's direction to the SOG operators to destroy evidence of it); using Jane Doe's defensive reaction as justification for further punishment and retaliation against Jane Doe (Dyer, Fickett, Walters, McLauchlan, and Calvert); using the provoked 12 second outburst so as to affirmatively distort her behavior (Fickett, Farmer, Dyer, Walters, McLauchlan, Calvert and the Senn defendants); deliberately discarding the shoulder cam video of the Fickett strangulation as Dyer directed despite policy mandates (Dyer, Fickett, Walters, Calvert, and McLauchlan); and agreeing among themselves to file no Use of Force reports about the strangulation despite policy mandates that they do so (Fickett, Farmer, Dyer, Walters, McLauchlan, and Calvert).

147.   After Fickett strangled Jane Doe, provoking the 12 second reaction from Jane Doe, the deputies escalated their use of force against Jane Doe to retaliate against her.

148.   After Fickett strangled Jane Doe, Defendants Farmer, Dyer, Fickett, Walters, McLauchlan, and Calvert had a conversation outside of the strip cell, recorded on Walters' shoulder camera, in which the Defendants laid out their plan to use excessive force against Jane Doe.  The first step of the plan had been the strangulation, to get Jane Doe to react.  Defendants Dyer, Fickett, McLauchlan, Walters and Calvert then conferred.  As shown in the video, Walters

did not destroy from his shoulder camera, Fickett proposed the plan to which all agreed: to take Jane Doe to "1A" (administrative segregation), demand to strip search her, then "if she refuses, then she goes in the chair," a reference to the "Emergency Restraint Chair." Dyer, Fickett, McLauchlan, Walters and Calvert all agreed, planning in advance their need for "emergency" restraints of and response to Jane Doe.

149. Defendants Dyer, Fickett, McLauchlan, Walters and Calvert each agreed with the plan, and acted on the plan.

150. Farmer disclosed her intention to retaliate against Jane Doe for what Farmer's report called "refusing obey order" [sic]. Farmer's report gave as her stated rationale for using force against Jane Doe that Jane Doe was "booked on the charge of Assault on Police Officer" and she "was not going to do anything without speaking to her lawyer first." Each other use of excessive force followed from Farmer's initial use of excessive force.

151. Neither basis cited by Farmer (Jane Doe's charge and her demand to call counsel) is a proper basis for retaliation or discipline. Farmer's report reflects that Farmer provided Jane Doe neither access to a telephone nor information about telephone access, as jail policies require.

152. Farmer chose to discipline Jane Doe for demanding to exercise her right to call counsel, and imposed improper discipline by escorting her to "1A," the jail's administrative segregation unit.

153. Farmer's report states, "Sog [sic] officers Fickett, Walters, Calvert and McLaughlin escorted [Jane Doe] to 1-A on the charge of B-8 Refusal to obey an order, whether verbal or written."

154. No Due Process was given Jane Doe before that punishment was given her for her supposed violation. She was retaliated against due to her charge or because she demanded her

right to call her lawyer.  State minimum standards require Due Process for such punishments.

None was given.  Nor does Farmer pretend to have given any Due Process.  A hearing at which

Jane Doe was not permitted to consult with counsel was held on less than 24-hour notice, despite

state minimum jail standards.

155.   Nor was any water given to Jane Doe at any point during her confinement at the

jail, a physical deprivation also intended by the deputies (Dyer, Farmer, Fickett, Walters,

Calvert, and McLauchlan) to punish Jane Doe.

156.   Minimum state jail standards require that a sanction for "disciplinary separation"

or any "punitive segregation" is a "major" violation, for which Due Process (including 24 hour

notice and a hearing) is required, and which can be imposed only "based on legitimate

government interests related to safe and secure operation of the facility."

157.   Nothing about Jane Doe wanting to talk to a lawyer threatened the security of the

jail.  It threatened only that she might not spend a hellish night at the jail, as the Defendants

intended.  Nothing about Jane Doe having been charged with assault on a police officer

threatened the security of the jail, even if the charge had been truthful.

158.   Jane Doe was not given Due Process before being placed in punitive segregation, a

violation of her rights under the Fourteenth Amendment.

159.   As noted above, minimum state jail standards require that a sanction of

"administrative separation" can be imposed only based on "behavioral factors that may pose a

serious threat to the orderly operation or security of the facility."  Nothing about Jane Doe

wanting to talk to a lawyer or in how she was charged, and nothing about the charge or

demanding to call a lawyer met that standard.

160.    Moving Jane Doe to 1A was retaliatory, and constituted excessive force used against her that deprived her of her civil rights.

161.    Minimum state standards also require that detainees placed in administrative separation maintain their basic rights, including the right to communicate with counsel and access to water.  Jane Doe was deprived of those rights.

162.    Jane Doe was moved to 1A as a pretext for again demanding of her another strip search, but doing so in a context in which a strip search could at least claim to be justified, even though it was not justified.  Jane Doe did not in any way actively resist being moved, even though at points she was deliberately twisted in painful stress positions.  Her "resistance" was asking to call her lawyer.

163.    Deputy Walters, a male, explained to Jane Doe that to get a phone call she had to submit to a strip search.  This created the deliberate misimpression that Walters would be the person who stripped searched Jane Doe, despite requirements that prohibit a male from strip-searching a female, and despite minimum state jail standards that prohibit dehumanizing discipline or treatment.

164.    Walters explained to Jane Doe the strip search was a necessary predicate to her using the telephone, simultaneously and intentionally violating and misrepresenting the jail's strip search, use of force, and telephone policies.

165.    When Jane Doe refused to be strip searched by Walters, a choice the Defendants were not even entitled to require of her, and another form of excessive force, the "ERC," was used to retaliate against her.  No behavior by Jane Doe justified the excessive force the ERC represented.

166.    The "ERC" is the Emergency Restraint Chair: a wheeled chair designed to immobilize the body, arms, legs, waist, and shoulders of anyone presenting an "emergency" threat to security, such as the "emergency" of a detainee who desired her right to call her lawyer.

167.    The ERC was ordered to be used against Jane Doe by Dyer, according to the Use of Force report that was written by Fickett.

168.    In that Use of Force report, Fickett explained that Jane Doe "also had previously been charged with assault on an officer," and reported she "refused to comply" and was "noncompliant."  Fickett does not state, as Farmer did, that her "noncompliance" was that Jane Doe demanded to call her lawyer, but the objective record discloses no other form of her being "noncompliant."  Fickett also does not report her assault of Jane Doe.

169.    **Conspiracy technique 10: falsely claiming Jane Doe was intoxicated**.  Fickett also wrote in her report, as other jail documents also summarily conclude, falsely, that Jane Doe was "highly intoxicated," even though (a) Jane Doe was perfectly coherent, even when angry, in the jail videos, and (b) it is undisputed (and undisputable) that the two glasses of wine Jane Doe had consumed that evening in her home (after her workday ended and before she went to sleep) was not sufficient even to put Jane Doe over the legal limit for blood alcohol content had she been driving when arrested rather than arrested after being asleep in her bed for 30 minutes before being arrested.

170.    As part of the Sheriff's spoliation practice, and as part of the conspiracy to deprive Jane Doe of her rights, deputies were careful to avoid taking any objective measure of Jane Doe's supposed "intoxication."   Each claim that she was "intoxicated" is false and defamatory, accused her of a crime, and is part of the conspiracy to distort Jane's conduct at the jail so as to

deprive her of her civil rights by justifying excessive force used against her, and used to deprive her of access to counsel and the courts to vindicate her civil rights.

171.   **Conspiracy technique 11: the ERC**.  To get Jane Doe into the ERC, Walters demanded of her "a quick strip search." When she declined, she was placed in the ERC, which deprived Jane Doe of Due Process, and constituted excessive force against her.

172.   Jane Doe posed no physical resistance to being placed in the ERC, despite being twisted into painful stress positions by Walters and Fickett.  She only asked repeatedly to call her lawyer, and expressed her amazement that in the United States a person can be arrested from her bed for no apparent reason after warrantless police entry to a home for no apparent reason, taken to jail for no apparent reason, and incarcerated with no opportunity to begin her defense (and provide for her abandoned mother) by communicating with family or a lawyer about the wrongful arrest. "Look how great it gets," she observed as she was being strapped into the ERC. "Locked away forever."

173.   The State, having elected to charge and arrest Jane Doe, took steps to assure that she would be unable to meaningfully communicate with counsel to prevent her from (a) responding to the charge made against her, (b) objecting to the conditions of her confinement, (c) objecting to the force being used against her, (d) objecting to the infringement of her rights, and (e) getting assistance for her abandoned mother.  Each infringed Jane Doe's Constitutional rights and which deprived Jane Doe of access to the courts.

174.   Jane Doe's arms were placed into the ERC by a simple, effective method.  To secure Jane Doe's left hand in the ERC, Walters placed his hand from the front through the left hand loop on the ERC.  Jane Doe's left hand was then placed in his hand.  He pulled his own and her hand through the loop, and the fabric restraint was tightened around her left hand.  The same

procedure in mirror image was used to place her right arm in the ERC.  Other than asking to call her lawyer, or asking for Deputy Chief Coyle Kinard to be called to assist her mother, Jane Doe resisted neither of her arms being restrained, nor either leg, nor her waist, nor each of her shoulders.

175.    Once in the ERC Jane Doe's confinement and restraint was total.  She could move no part of her body other than her head.  She continued to ask to call her lawyer and to ask for Deputy Chief Coyle Kinard to be notified so as to assist her mother.

176.    Telephones exist in administrative separation.  Even while in the ERC in 1A, Jane Doe could have been given access to a telephone and one arm freed to enable her to use the phone.

177.    State minimum jail standards prohibit "instruments of restraint" (which includes the ERC) except on three conditions, none of which was applicable to justify putting Jane Doe in the ERC.  The only explanation for the ERC was the desire to retaliate against her.

178.    State minimum jail standards on using restraints and detainee rights afforded Jane Doe a property and liberty interests and Due Process rights, each of which was compromised by the SOG team members placing her in the ERC when none of the factors was present that the state requires for restraint devices.

179.    The "emergency" condition the Sheriff and his deputies were responding to was that but for their intervention of excessive force used against Jane Doe, that Jane Doe might present the "danger" of communicating with counsel.

180.    Defendants prevented Jane Doe from communicating with counsel out of concern that Jane Doe might not have to spend a hellish night in the jail if she was allowed to call her lawyer.  Nor could the jail cause Jane Doe to worry for her mother if she knew her mother had

been provided for.  The Defendants desired Jane Doe have both concerns, even though both were unnecessary.

181.    Although it violated her Due Process rights, and was an improper use of force, Jane Doe was placed in the ERC within an hour of her arrival.  Ample opportunity was taken by the male deputies to look up her skirt as she was strapped into the ERC, tipped upwards, and wheeled to be in full view of other male detainees, all in violation of jail policy and state minimum jail standards but consistent with a desire to retaliate against Jane Doe. Afterwards, Jane Doe was given a cover for her lap.

182.    Once in the ERC, Jane Doe's arms and legs were restrained, as was her waist, as were each of her shoulders.  She could not move.

183.    **Conspiracy technique 12: sexual degradations by being put on display**. State minimum jail standards require female detainees to be housed separately (as to sight and sound) from male detainees. Jane Doe was housed in violation of those standards, and while immobilized in the ERC was deliberately placed in the center of the room, so as many as possible of the male detainees in 1A could view her, even though the placement was unnecessary.

184.    Within the hour of her arrival, Jane Doe had been refused information about her charge; was given false information about her charge; was strangled by Fickett while defenseless so as to provoke her into defending herself (with the SOG operators agreeing to destroy all shoulder camera video of the strangulation); was refused her right to telephone calls; was retaliated against for demanding to call her lawyer (or because of her charge, or both); was plotted against by deputies who planned out the sequence of excessive force to use against her; had three instances of excessive force used against her (the strangling, punitive segregation, and

the ERC); and was put on improper display for male deputies and detainees in violation of state minimum standards and her Due Process rights.

185.    That summarizes Jane Doe's first hour at the jail.  Had she been permitted to call her lawyer, as she had a right to do, she might have been already out of the jail in the first hour, precisely the "danger" the Defendants prevented by depriving her of her rights.

186.    Unknown to Jane Doe after her first hour of confinement, still ahead of her were two hours of taunting from SOG officers and A1 deputies, a Tasing, more sexual degradations, and thirteen more hours without being allowed to make a phone call for either a lawyer or to get someone to provide for her mother.

187.    For two hours Jane Doe was in the ERC with four or more SOG officers around her, and A1 staff around her (including Defendant Washington), taunting her about being arrested for abusing her mother, an activity prohibited by policy and law, before other detainees and other deputies.  Jane Doe was, at most, conversational, and completely coherent.  She was in no manner disruptive.  Given her restraints, she could not have been disruptive if she had desired to be.

188.    **Conspiracy technique 13: Improper use of Taser**.  After two hours of sitting immobilized in the ERC, about 1:30 a.m., Fickett loosened the strap on Jane Doe's left forearm to let her "stretch" that arm for a few minutes.  When she replaced it, her right arm was loosened so she could similarly "stretch."  Her left arm and legs, her waist, and her shoulders remained strapped in by the ERC.  She was entirely immobilized, and could neither get out of the ERC nor cause the ERC to move.

189.    With her right arm free, Jane Doe refused to put her right arm back into the restraint.  She was talking with Walters, gesticulating as she spoke with him in normal

conversational tones.  Walters advised that "force" would be used against her if she did not put her arm back into the restraint.  Jane Doe had reached such a point of despair that she asked, "what are you going to do, shoot me?"  Walters told her that his partner, meaning Fickett, would "drive stun" her.

190.   Neither Walters nor anyone else informed Jane Doe that Walters and Fickett were prepared to violate jail policy and use a "Taser" against her, as jail policy requires before a Taser is used.  Neither Walters nor anyone else informed Jane Doe that the Constitution prohibited using a Taser against her because she was already restrained.

191.   Before 1997 the Fourth Circuit had prohibited (on Constitutional grounds) using force against a person already restrained, absent a reasonable threat of physical danger to a deputy.

192.   Fickett then violated simultaneously the use of force policy, Constitutional standards, and the Taser policy by applying her Taser to Jane Doe's left forearm without proper justification, and without proper warning, while Jane Doe was completely restrained except for her right arm, and completely unable to move but for her right arm and head.

193.   At the moment before she was Tased, in her fully restrained state, it is impossible that Jane Doe could have reasonably been believed to have posed an "immediate threat to the safety" of anyone.  She weighs 110 pounds and had only her right arm free.

194.   The video of Fickett's Taser use shows the Taser discharge was more than 7 seconds in duration, an unnecessarily long time for a Taser use that was not permitted by law and should not have happened at all.  Stills from the Taser video showing the time clock are attachment B to this Complaint.

195.   Using force on Jane Doe when she "was unarmed and effectively was secured," has been clearly unconstitutional since well before 2003 when *Bailey v. Kennedy* was decided by the United States Court of Appeals for the Fourth Circuit.

196.   Using force in the form of a Taser on Jane Doe when she "was unarmed and effectively was secured," has been clearly unconstitutional since not later than 2008 when *Orem v. Rephann* was decided by the United States Court of Appeals for the Fourth Circuit.

197.   The drive stun mode on the Taser X26 is intended to be used only for "pain compliance" — meaning to punish or intimidate — precisely the reasons clearly prohibited in 2008 by the United States Court of Appeals for the Fourth Circuit in *Orem v. Rephann*.

198.   Taser use is severe and injurious regardless of the mode to which the Taser is set.

199.   Fickett has testified that she has been a deputy since May, 2012 and has been given no training about any restrictions on using a Taser against a person who is already restrained, such as was clearly established not later than *Orem* and the objective reasonableness standard set forth in that 2008 decision.  She also testified that she has herself applied a Taser to approximately 20 persons who were already restrained.

200.   Fickett's testimony about her lack of Taser training as to restrained persons, and the number of times she has herself used a Taser on a person already restrained, reflects deliberate indifference by the Sheriff to properly training his deputies in limitations on use of force.

201.   There was no legitimate justification that objectively viewed, reasonably justified using a Taser on Jane Doe.  Its use constituted excessive force.

202.    Jane Doe weighs 110 pounds, had presented no physical resistance, presented resistance only in the form of wanting to exercise her right to talk with a lawyer, was fully

restrained but for one arm, posed no threat to any of the four deputies which surrounded her when she was Tased (to say nothing of the other deputies in 1A), and could not possibly have escaped from her arm, leg, waist, and shoulder straps.  She embodied less than "minimally risky resistance" and constituted an "unarmed and effectively secured," person against whom Taser use was entirely improper and unreasonable.

203.   In her testimony, Fickett acknowledged that she had options other than Taser to restraining Jane Doe's right arm, including the technique used to initially restrain her arm.  She testified that she preferred the Taser so as to "stay away from" Jane Doe, testimony not objectively reasonable (and at best disingenuous), in light of the substantial physical contact Fickett had already used against Jane Doe when she was less restrained,  including directly strangling Jane Doe, moving her to administrative segregation and moving her to the ERC.

204.   Fickett's use of the Taser on Jane Doe was sadistic and wanton, as is her apparently routine practice to use a Taser against persons already restrained.  Her use of force against Jane Doe was excessive, unreasonable, prohibited under then-existing conditions, and banned by each of the Constitution, the minimum state standards and the jail use of force policy.  Her Taser use was objectively unreasonable and prohibited by law.

205.   Fickett is incompetent and the Sheriff has been deliberately indifferent to properly training her.

206.   Walters, Calvert, and McLauchlan are each incompetent, and the Sheriff has been deliberately indifferent to properly training them in use of Taser against a person already restrained.

207.   For about another hour after Tasing, so until about 2:30 a.m., Jane Doe was kept in the ERC.

208.   **Conspiracy technique 14: improper strip search**.  As planned among the Defendants the night before, once Jane Doe agreed to come out of the restraint chair an hour or so after her Tasing, the next improper use of force for her was a strip search.  There was no proper basis for a strip search, and it violated her Fourteenth amendment rights.  The Defendants prohibited her from talking with a lawyer before they imposed on her the strip search.  The "need" for a strip search was contrived, was retaliatory, and was imposed without proper justification or Due Process, improperly infringing in those three independent ways on Jane Doe's rights.

209.   Jane Doe underwent a strip search.  After her strip search, she was still not permitted to make any phone call.

210.   **Conspiracy technique 15: intentional sexual degradations through being given a man's one-piece uniform**.  No use of force report was prepared by any deputy for Jane Doe's strip search.

211.   During the strip search, the jail confiscated her bra, since the bra in which she had been arrested was gray.  Contrary to jail policy, when the jail removed her clothing she was given no white replacement.  Solely to humiliate her further, and contrary to her rights, Jane Doe was then intentionally given one-piece male clothing rather than two-piece female clothing.  Combined with being housed (contrary to her rights) in full view of male detainees and deputies, each time she used the restroom in her cell not only was she compelled to do so in full view of men, she was compelled to disrobe her upper body in full view of those male detainees and employees.

212.   Deputies Fickett, Walters, Calvert, and McLauchlan intentionally degraded Jane Doe to retaliate against her.

213.   And after that, Jane Doe was still not given access to a phone call.  Walters had simply lied to her about the burdens they intended to use to frustrate her ability to call a lawyer, and because the strip search was gratuitous.  Each of the excessive force conditions Walters imposed on her as a condition to using the telephone was fabricated by Walters to enable force to be used against her, then to enable them to degrade Jane Doe.

214.   Jane Doe was then denied bail.  The arresting officer opposed her bail, despite that officer having changed the charge to simple assault, and without informing the bond court that the charge had been changed from Assault on Police to Simple Assault.

215.   After Jane Doe returned from her bail hearing, when it appeared she would never be permitted to tell anyone she had been arrested, she expressed her despair to a day shift deputy, who told her, 'when you are charged with assaulting an officer, you get no rights."

216.   As far as Jane Doe could tell, the state had determined to confine her without ever permitting her access to basic rights to communicate with family, to communicate with counsel, or to prepare a defense.  And she was, of course, also aware that her mother remained alone at their home, unable to care for herself.  All requests by Jane Doe to alert others that her mother needed help were ignored at the jail.

217.   Jane Doe was not permitted access to a telephone throughout the morning of her second day of confinement.

218.   Not until about 1 p.m. on the second day of her confinement was Jane Doe given access to a telephone.  Her access was about 14 hours after her arrival, about 11 ½ hours after she was Tased, and about 10 ½ hours after she was strip-searched.  She called her uncle to report by voice mail message where she was, that her mother had been alone since the night before, hence had not eaten since the previous evening.

219.   Her uncle left his workplace, went to her mother (his sister), got the mother something to eat, and came to retrieve Jane Doe from the jail.  Jane Doe was authorized to be released only at 3 p.m.

220.   Because she had to wait to be photographed and fingerprinted, Jane Doe was not able to actually leave the jail until about 4 p.m.

221.   Jane Doe had been in the jail since 10:45 p.m. the night before, a total of 17 hours and 15 minutes.

222.   For over 14 hours the jail prevented Jane Doe from making a phone call, had assaulted her for demanding to make a call, had improperly conditioned her access to a telephone call with excessive force and improper privacy intrusions, had lied to her about what the preconditions to making a phone call would be, and had applied excessive force against her in multiple ways (strangling, administrative segregation, the ERC, strip search and Taser).  Sexual degradations of being put on display and being given improper clothing were arranged for her specifically, exposing her to male deputies and male detainees.

223.   The Defendants had assured that Jane Doe spent a hellish night in jail, which the Defendants did not want to risk might not occur if Jane Doe had been allowed her right to make a telephone call to counsel as she is entitled to make.

224.   The jail deputies deprived Jane Doe of her rights and used excessive force against her in retaliation for the charge against Jane Doe, and for her demand to exercise her entitlement to telephone legal counsel, or both.

225.   State minimum jail standards prohibit deputies from assaulting a detainee, and require that Fickett's assault should have been "investigated and documented." Neither an

investigation nor documentation of Fickett's assault was done, other than the ceiling camera video from the strip search room that was (apparently inadvertently) preserved.

226.    Either the Sheriff has been deliberately indifferent to training each of his deputies in proper use of force and protecting civil rights, or the Sheriff intends that his deputies use force improperly by assaulting detainees, including his apparent ratification of Fickett's assault on Jane Doe.

227.    As noted above, no Use of Force Report was submitted by any deputy after Fickett strangled Jane Doe in the first minute of the Fickett-Doe interaction.

228.    **Conspiracy techniques 16 (administrative segregation), 17 (ERC) and 18 (Taser): Reviewers who sanction rights violations**.  Farmer prepared a Use of Force Report for Jane Doe's "discipline" by administrative segregation (referred to at the jail as unit "1A").  That report admits that segregation was imposed without the Due Process standards mandated by state minimum jail standards and Jane Doe's Fourteenth Amendment Due Process rights.

229.    The report itself notes that Jane Doe is being disciplined (without Due Process) by segregation for two reasons.  First, that Jane Doe was "booked on the charge of Assault on Police Officer," and second, "that she was not going to do anything without speaking to her lawyer first."  The report is unambiguous that Jane Doe was disciplined because of her charge and because she wanted to consult counsel, each of which grounds violates Jane Doe's constitutional rights, state standards, and the jail's own policies.

230.    That the Farmer **Use of Force Report for administrative segregation** was reviewed, and approved, by Dyer and Andrew Grant despite the plain violations it reflects, indicates the Sheriff's deliberate indifference to training his deputies to protect Constitutional

rights under the First, Sixth, and Fourteenth Amendments, state minimum standards and jail policy.

231.    Through Dyer, Deputy Fickett submitted a **Use of Force Report for** Dyer having ordered use of the **Emergency Restraint Chair** against Jane Doe, the emergency being that without restraint in the ERC Jane Doe might communicate with counsel.  That report contains narrative by Fickett, which is patently false and contrary to the objective evidence that survived the Sheriff's spoliation practice.  The report notes that Jane Doe "also had previously been charged with assault on an officer."  The charge against Jane Doe is explicitly listed as a factor in that use of force, which violated Jane Doe's civil rights under the First, Sixth, and Fourteenth Amendments.

232.    Fickett's Use of Force report for the ERC was reviewed by Dyer and Andrew Grant, neither of whom raised any question about the reported policy and law violations involved with using force against Jane Doe because she wanted to call counsel.  That neither Dyer nor Grant had a problem with the circumstances of the ERC use reflects the Sheriff's deliberate indifference to properly training his deputies to protect Constitutional rights under the First, Sixth, and Fourteenth Amendments.

233.    Fickett also prepared a **Use of Force Report for the Taser** use directed at Jane Doe even though Jane Doe was fully restrained before the Taser Use.  Fickett acknowledged it was she that applied the Taser to Jane Doe, and lists as other "staff involved" her other SOG members: Walters, McLauchlan, and Calvert.  Each is sued individually.

234.    Before the Tasing, Fickett, Walters, McLauchlan, and Calvert (and four other 1A deputies) were each readily available to "overpower" Jane Doe's free right arm, had that been

genuinely needed. Each SOG operator participated in the improper Taser use against Jane Doe. None objected to that improper Taser use.

235. Fickett's Use of Force report of the Tasing claims "facts" not reflected in the objective record the Sheriff had failed to discard, including the length of the Taser discharge used against Jane Doe (which the video record not destroyed reflects was not less than 7 seconds, as reflected in Attachment B to this Complaint). However, Fickett's report plainly admits that the Taser was used against Jane Doe (a) when no reasonable person could believe any danger was presented (the report claims none), (b) when Jane Doe was already fully restrained in the ERC (which the report admits), and (c) to punish and intimidate the already restrained Jane Doe into "compliance," precisely the uses banned in not later than 2008 by the United States Court of Appeals for the Fourth Circuit.

236. The report narrative also plainly states that the Taser was used because Jane Doe "was in the emergency restraint chair and refussed [sic] to put her arm back after being instructed to put her arm back in the strap," a type of prohibited Taser use which concedes there was utterly no danger presented or even claimed.

237. The Use of Force report for the Taser notes that Jane Doe was charged with "Assault on Police Officer," reflecting that the charge against her was an improper factor in the decision to use the Taser.

238. Deputies Walters, McLauchlan, Calvert and Sanders watched Fickett use the Taser against Jane Doe while she was already restrained in the ERC. Walters directed that Fickett "drive stun" Jane Doe. None reported Fickett for excessive force when she used a Taser on a person already restrained when no danger was present. McLauchan and Calvert each deleted his shoulder camera video of the Tasing.

239.   Deputy Matthewes was the on-scene supervisor, and she personally reviewed the scene after Jane Doe was Tased.  She saw, and had explained to her, that Jane Doe was in the ERC but for her right arm when she was Tased.  She filed no report against Fickett for excessive force, and ratified Fickett's behavior when Fickett explained that Jane Doe had been Tased while fully restrained other than for her right arm.

240.   Deputies Durbin, Sanders, Tice, Key, and Beatty each reviewed the Use of Force report for the Taser use against Jane Doe, which admitted (a) that Jane Doe was already restrained in the ERC when she was Tased, (b) that one factor in the Taser use was the charge against Jane Doe, and (c) that no danger is claimed to have been present to justify the Taser use. Each deputy reviewer approved the use of Taser, despite the plain violation of Jane Doe's Due Process rights in Jane Doe having been Tased while already restrained, as prohibited by *Orem*.

241.   Each of the various uses of force against Jane Doe reflected both wanton pain and suffering inflicted on her that violated her Constitutional rights, and the Sheriff's deliberate indifference to properly training his deputies and their reviewers to protect Constitutional rights.

242.   In 2014, Jane Doe's family first consulted counsel to find out how police had come to initiate the remarkable chain of events that began with police breaking into their home without a warrant to arrest Jane Doe from her bed on a false charge and caused her to have her rights abused at the jail as set out in this Complaint.

243.   A June, 2014 FOIA response for records from the jail resulted in communications from counsel for Charleston County, who involved the Senn defendants on behalf of the Sheriff. It is not known if the Senn defendants participated in the spoliation process of what jail video to destroy, but it is known that jail video was first produced only through the Senn defendants and after consultation by the Sheriff with the Senn defendants.

244.    When suit was filed for Jane Doe's mother over the police misconduct, the Senn defendants represented the City of North Charleston and various police officers. That suit concerns the mother's interest in the warrantless entry and being left to fend for herself after Jane Doe was removed.

245.    Actions taken by Sandra J. Senn were taken on behalf of Senn Legal, LLC, but are also actions either on behalf of Sandra J. Senn herself, or on behalf of the Sheriff and his deputies, or on behalf of the City of North Charleston and its officers, or on behalf of some combination of each of those respective clients.  This Complaint, at present, and until clarified otherwise, assumes the tortious actions of Sandra J. Senn were taken as a representative for Senn Legal LLC and for Sandra J. Senn individually.

246.    Conduct by Sandra J. Senn is conduct on behalf of Senn Legal, LLC. But may not be conduct by Sandra J. Senn, individually, as this Complaint at present assumes.

247.    If in her response Sandra J. Senn clarifies that her individual tortious conduct was in a capacity other than on behalf of herself, then appropriate adjustments will be reviewed.  For example, one or more of her clients may agree that her tortious acts were taken on that client's behalf, not on behalf of herself.

248.    Only one recovery is sought for the tortious conduct of the Senn defendants.

249.    In each of 2014 and 2015, the Senn defendants published to third parties writings, which defamed Jane Doe.

250.    Jane Doe is a private figure, not a public figure, for purposes of defamation analysis.

251.   Among other things, in unprivileged writings to third parties, the Senn defendants in 2014 claimed that Jane Doe's Tasing at the jail had not happened, and her report of Tasing was false.

252.   When the statements were made, the Senn defendants were well aware that it was undisputed that Jane Doe had been Tased while restrained, and that representations to the contrary by the Senn defendants were known to be false when made.  Alternatively, the Senn defendants published a defamatory writing about Jane Doe in reckless disregard of the falsity of their writings.

253.   The defamatory comments accused Jane Doe of falsely reporting the crime committed against her by Fickett, and are statements defamatory *per se* of Jane Doe and actionable *per se*.  The comments were reported to third persons that were aware of Jane Doe's identity, and Jane Doe is referred to by name in the defamatory writing.

254.   The Senn defendants also had an ulterior and illicit purpose in defaming Jane Doe. Through the defamatory comments about Jane Doe the Senn defendants were also trying to, and did, improperly influence witnesses against Jane Doe, and succeeded in that improper influence. The influence was created by disparaging misrepresentations of fact by the Senn defendants about Jane Doe.

255.   The Senn defendants also published to third parties false statements that in "the restraint chair area" at the jail (where the Tasing occurred) Jane Doe "was yelling and cursing and demeaning to everyone."

256.   The Senn defendants knew that the information published to third parties was false.  As alleged above, in these comments the Senn defendants were also advancing (with other Defendants named in this Complaint) the conspiratorial objective of using Jane Doe's 12 second

reaction to Fickett's unlawful strangulation (which had not occurred in the "restraint chair area"), to distort Jane Doe's 16 hours at the jail. The Senn defendants by these comments also defamed Jane Doe.

257.   The Senn defendants also published to third parties in 2015 about Jane Doe false and defamatory *per se* statements, which implied that facts existed to support the statements, that the Senn defendants "suspect[ed] the family had cleaned her [Jane Doe's mother] up for the lawyer's visit." The Senn defendants were claiming, falsely, to have a factual basis from which they represented that "the family," meaning Jane Doe and her mother's two POAs (Jane Doe's uncle and brother) were abusing the vulnerable adult in their family (a felony in South Carolina) but as a deception had "cleaned her up" when they asked to meet with counsel about the infringements of mother's rights.

258.   Also in 2015, the Senn defendants published to third parties the defamatory statement that Jane Doe was "a crazy lady," and, more remarkably, admitting that the Senn defendants had undertaken, with others, an unsuccessful effort to intimidate Jane Doe. A series of retaliatory actions have been taken against Jane Doe by North Charleston, actions which are at issue in the present case for the mother. The Senn defendants acknowledged the effort to intimidate Jane Doe and assessed those efforts as having failed when the Senn defendants wrote, "we can't seem to shake her." The retaliatory conduct to intimidate Jane Doe because her mother had brought suit over the police misconduct is the subject of other litigation as to defendants other than the Senn defendants, who serve as defense counsel in that action, not party to that action.

259.   The 2015 writings by the Senn defendants were simultaneously defamatory and disclosed unethical conduct to try to wrongfully influence witnesses against Jane Doe, retaliate

against Jane Doe, and try to intimidate Jane Doe to keep her from accessing the courts to redress her own civil rights violations and in retaliation for her mother's agents acting to redress her own civil rights violations.

260.    The defamation by the Senn defendants is actionable *per se* and defamatory *per se*, and damaged Jane Doe.  Damages are presumed as a matter of law, and actual and punitive damages should be awarded to Jane Doe by the finder of fact.

**For a First Cause of Action:**
**Deprivation of Rights Under 42 USC §§ 1981 and 1983**
(Against Defendant Sheriff for injunctive relief)

261.    Allegations above are incorporated into this count as if fully stated.

262.    This cause of action pursuant to 42 U.S.C. § 1983 is directed against the Sheriff in his official capacity for injunctive relief.

263.    The Sheriff has failed to train his deputies on the constitutional limits against excessive force, the proper justification needed for using force, the prohibitions against assaulting a detainee, the right of a detainee to have access to counsel, the right of a detainee to have access to telephone calls, the circumstances for reporting crime by another deputy, and the duty to preserve evidence.

264.    The Sheriff's deputies acted under color of state law, and either pursuant to the Sheriff's custom, policy or practice, which in some circumstances (as Fickett testified) overrides the articulated jail policies, so as to have violated in multiple ways Jane Doe's Constitutional rights.

265.    Jane Doe is a citizen of the United States, and a citizen and resident of South Carolina.

266.    Jane Doe has substantive Due Process rights to (a) her bodily integrity, (b) her personal security, (c) protections from assault while confined, (d) protections from the government creating for her dangers and harm, and (e) protections from the government rendering her more vulnerable by placing Jane Doe in a worse position during her confinement, thereby increasing her risk of harm.  Under the Equal Protection Clause, Jane Doe also has an independent substantive right to not be denied protective services by the state, the state thereby affirmatively acting so as to create a danger for her and increase her risk of harm.

267.    Fickett was permitted to assault Jane Doe while she was in the Sheriff's custody and already restrained.  Fickett did so in full view of other employees.  None reported Fickett, all agreed to dispose of their shoulder camera video so the incident could be plausibly denied, as Fickett does in other shoulder camera video portions preserved.

268.    The Sheriff uses a spoliation practice to destroy evidence of misconduct by deputies.  A spoliation instruction should be given over the Sheriff's practice of deliberately destroying video, and of doing so to misrepresent a detainee's experience at the jail and to conceal misconduct as to detainees, each of which was done as to Jane Doe.

269.    By 2014 it was clearly established that the state could not take affirmative action to create a danger for any citizen or increase a citizen's risk of harm.  Those rights were established not later than by the 1989 United States Supreme Court decision in *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

270.    The Sheriff has inadequate procedures and training sufficient to compel its deputies to provide proper care for detainees, to protect access to counsel and family notification when detained, to protect detainees from assault, and to require evidence of a detainee's abuse to

be preserved.  The Sheriff should be enjoined from failing to develop adequate training and procedures sufficient for that purpose.

271.    The Sheriff has a custom or policy that deprived Jane Doe of the rights, privileges, or immunities secured to her by the Constitution and laws of the United States as well as of South Carolina, and subjected her to injuries, which she would otherwise have avoided.

272.    The Sheriff has a custom or policy to not spend the additional funds needed to have the proper training for his deputies, or resources for those deputies, so as to effectively provide for detainees and protect them from assault.

273.    Unless enjoined, the Sheriff will continue to fund and operate the jail in a manner which deprives detainees such as Jane Doe of constitutionally protected rights.

274.    Unless enjoined, the Sheriff will continue to use spoliation to destroy evidence of, for example, Fickett's assault on Jane Doe, such as was by agreement destroyed from all SOG operator shoulder cameras.  The Plaintiff is entitled to a spoliation instruction.

275.    Jane Doe is entitled to injunctive relief sufficient to prevent the Sheriff from failing to provide funds sufficient to train, and to sufficiently train deputies so as to operate the jail to protect Constitutional rights o detainees.

276.    The Sheriff's policy and practice to allow Constitutional rights to be infringed caused injury to Jane Doe, increased her risk of harm, and in fact caused her harm.  Unless enjoined, the Sheriff will continue to fail to train his deputies against creating a danger to detainees.

**For a Second Cause of Action:**
**Conspiracy under 42 U.S.C § 1983 to Deprive Rights**
(Against Defendants Cannon, Farmer, Dyer, Fickett, Walters, McLauchlan
and Calvert, individually, and any other defendant on whose behalf
Defendant Sandra J. Senn acted under color of state law)

277.    Allegations above are incorporated into this count as if fully stated.

278.    Unlike civil conspiracy under 42 U.S.C. § 1985, civil conspiracy under 42 U.S.C.
§ 1983 requires evidence that Cannon, Farmer, Dyer, Fickett, Walters, McLauchlan and Calvert
(and any other Defendant on whose behalf Sandra J. Senn acted as a representative under color
of state law) acted jointly in concert and took one or more overt acts under color of state law to
further the conspiracy which resulted in Jane Doe's deprivation of one or more of her
Constitutional rights.

279.    Cannon operated the jail and knew, or should have known, that his deputies
violated the Constitutional rights of detainees such as Jane Doe.  Cannon was deliberately
indifferent to properly training his deputies, training them instead to abuse detainees and use
spoliation to conceal their crimes against and abuses of detainees.  Cannon trains his deputies
who serve as reviewers to be indifferent, as Cannon is indifferent, to detainee abuse by
subordinate deputies.

280.    Each of Defendants Cannon, Farmer, Dyer, Fickett, Walters, McLauchlan and
Calvert shared the same conspiratorial objective to prevent Jane Doe from calling family or
counsel, and to retaliate against Jane Doe because she was charged with assaulting an officer or
for demanding to call counsel, or both.  Sandra J. Senn's later acts to further that conspiracy
implicates any other Defendant only if her conspiratorial actions were in a representative
capacity for a defendant acting under color of state law.

281.    As alleged above, not fewer than sixteen different actions were taken by the various defendants against Jane Doe to prevent her from exercising her Constitutional rights, to retaliate against her for demanding her rights or because of the charge against her, or both.

282.    Jane Doe is entitled to actual and punitive damages against each defendant in this cause of action, and alternatively any other state related defendant on whose behalf Sandra J. Senn acted in a representative capacity, for actions that furthered the conspiracy against Jane Doe to deprive her of her rights, destroy evidence of both the conspiracy and the rights violations, and to actually deprive her of her rights.

**For a Third Cause of Action:**
**Failure to Train under 42 U.S.C. 1983**
(Against Sheriff Cannon, individually)

283.    Allegations above are incorporated into this cause of action as if fully stated. In this cause of action Sheriff Cannon is sued individually.

284.    As of 2014, Sheriff Cannon had failed to train his deputies in standards established as early as 1979.

285.    In 1979 the United States Supreme Court clearly established that detainees retain the rights of unincarcerated persons, and that "under the Due Process Clause, a detainee may not be punished."

286.    In 2002 the Fourth Circuit Court of Appeals clearly established that a detainee may not be subjected to physical abuse.

287.    In 2005, the Fourth Circuit Court of Appeals clearly established that a detainee is protected from excessive force.

288.    In 2008 the Fourth Circuit Court of Appeals clearly established that using a Taser use on a person already restrained required a legitimate governmental purpose, such as protecting

a deputy, protecting a detainee, or preventing escape, none of which was present when a Taser was used against Jane Doe while she was strapped in to the ERC.

289.    According to Fickett, Sheriff Cannon has not trained his deputies even on his policies ("they messed up writing this policy" and "it doesn't match up") because the practice at the jail ignores policies on telephone access, use of force, and Taser use.

290.    Alternatively, Farmer, Dyer, Fickett, Walters, Calvert, and McLauchlan, are incompetent for (a) refusal to permit Jane Doe to make either of the two phone calls that the Sheriff's policies entitle her to make; (b) for Fickett assaulting Jane Doe and all deputies agreeing to not report it and to destroy all shoulder camera video of the assault; (c) for Walters directing, and Fickett executing, the Taser use against Jane Doe in the presence of Calvert and McLauchlan; and (d) for reviewers Matthewes, Durbin, Key, Tice, and Beatty approving Taser use which violated standards established in 2008.

291.    As a second alternative, Farmer, Dyer, Fickett, Walters, Calvert and McLauchlan were simply retaliating against Jane Doe due to the charge against her or for her demand to exercise her rights, or both, and reviewers Matthewes, Durbin, Key, Tice, and Beatty understood that Sheriff Cannon permitted such retaliation.

292.    Fickett testified that she received no training on using a Taser against a person already restrained, such as Jane Doe, who posed no danger to anyone and could not even move, let alone escape.

293.    Sheriff Cannon's failure to train his deputies reflects his deliberate indifference to the rights of Jane Doe and other detainees with whom deputies come into contact.

294.    Sheriff Cannon has failed to train his deputies on (a) a detainee's right to make "at least two" telephone calls during intake including a call to her lawyer, (b) a detainee's right to

not be assaulted by a deputy, (c) that a deputy should not agree to use spoliation to delete evidence of another deputy's assault on a detainee, (d) that a deputy should not agree to not report an assault committed by another deputy in his or her presence, (e) that the restraints on Jane Doe did not permit a Taser to be used against her, and (f) that a detainee may not be retaliated against based on either the charge against her or for demanding her rights.

295.    Alternatively, Farmer, Dyer, Fickett, Walters, Calvert, and McLauchlan, are incompetent for (a) refusing to permit Jane Doe to make either of the two phone calls that the Sheriff's policies entitle her to make; (b) for Fickett assaulting Jane Doe and all deputies agreeing to not report it and to destroy all shoulder camera video of the assault; (c) for Walters directing, and Fickett executing, the Taser use against Jane Doe in the presence of Calvert and McLauchlan; and (d) reviewers Matthewes, Durbin, Key, Tice, and Beatty are incompetent for approving Taser use which violated standards established in 2008.

296.    As a second alternative, deputies Farmer, Dyer, Fickett, Walters, Calvert, and McLauchlan, Matthewes, Durbin, Key, Tice, and Beatty are incompetent for taking, and approving, retaliation against Jane Doe for either the charge against her or for demanding her rights, or both.

297.    Jane Doe is entitled to actual and punitive damages against Sheriff Cannon for his deliberate indifference to train or direct his deputies in rights of detainees.

**For a Fourth Cause of Action:**
**Gross Negligence for Failure to Train**
(Against the Sheriff in his official capacity)

298.    Allegations above are incorporated into this cause of action as if fully stated. In this cause of action the Sheriff is sued in his official capacity.

299.    For each year since not later than 2008, the Sheriff has failed to properly train his deputies Farmer, Dyer, Fickett, Walters, McLauchlan and Calvert, and reviewing deputies Grant, Matthewes, Durbin, Key, Tice, and Beatty.

300.    The Sheriff's failure to properly train each of his 12 named deputies, each year since 2008, constitutes a separate "occurrence" of negligence under state law to the extent that the deputy has been employed since 2008.

301.    Sheriff Cannon's failure to train his deputies reflects gross negligence as to the rights of Jane Doe and other detainees with whom deputies come into contact.

302.    Sheriff Cannon has failed to train his deputies on (a) a detainee's right to make "at least two" telephone calls during intake including a call to her lawyer, (b) a detainee's right to not be assaulted by a deputy, (c) that a deputy should not agree to use spoliation to delete evidence of another deputy's assault on a detainee, (d) that a deputy should not agree to not report an assault committed by another deputy in his or her presence, (e) that the restraints on Jane Doe did not permit a Taser to be used against her, and (f) that a detainee may not be retaliated against based on either the charge against her or for demanding her rights.

303.    As many as 432 acts of gross negligence by the Sheriff may apply, to the extent each of the 12 deputies has been employed each year between April 29, 2008 and April 1, 2014.

304.    Jane Doe is entitled to damages against the Sheriff for his gross negligence in failing to properly train or direct his deputies in rights of detainees.

**For a Fifth Cause of action**
**Deprivation of Rights under 42 U.S.C § 1983**
(Against Defendants Farmer, Dyer, Fickett, Walters,
McLauchlan, and Calvert, individually, and alternatively, Sandra J. Senn)

305.    Allegations above are incorporated into this cause of action as if fully stated, including the alternative allegations of the capacity in which Sandra J. Senn may have taken tortious actions under color of state law in a representative capacity for any other Defendant.

306.    Not fewer than eighteen rights violations of Jane Doe's Constitutional rights are set forth above and are incorporated into this cause of action, involving depriving her of her rights protected by the First, Sixth, and Fourteenth Amendment of the United States Constitution.

307.    Defendants Farmer, Dyer, Fickett, Walters, McLauchlan, Calvert, and (alternatively) one or more other Defendants (if Sandra J. Senn acted in a representative capacity for one or more other Defendants under color of state law), deprived Jane Doe of her Constitutional rights acting under color of state law through those different methods alleged above.

308.    Jane Doe was deprived of clearly established federally protected rights, and was retaliated against for the charge against her, or for demanding her rights, or both.

309.    Jane Doe's rights protected by the First, Sixth, and Fourteenth Amendments to the Constitution of the United States were infringed by the Defendants named in this cause of action, and excessive force was used against her in the multiple ways which violated her federally protected rights.

310.    Jane Doe is entitled to actual damages, and punitive damages, against each of the defendants (and alternatively any other Defendant through Sandra J. Senn) for each of the sixteen counts of her federal rights having been infringed.

**For a Sixth Cause of action**
**Supervisor Liability under 42 U.S.C § 1983**
(Against Defendants Dyer, Grant, Matthewes, Durbin, Key, Tice, and Beatty)

311.    Allegations above are incorporated into this cause of action as if fully stated.

312.    Defendants Dyer and Grant had actual knowledge of excessive force being used against Jane Doe without Due Process in the form of administrative segregation and the ERC, imposed without proper justification and to retaliate against her for being charged with assault on a police officer, or for demanding her right to call counsel, or both.

313.    Each of Defendants Matthewes, Durbin, Key, Tice, and Beatty had actual knowledge that a Taser was used against Jane Doe when she was already restrained, in violation of her Due Process rights.

314.    Each of Defendants Dyer, Grant, Matthewes, Durbin, Key, Tice, and Beatty are themselves liable to Jane Doe for their respective roles in reviewing, and approving, the excessive force used against Jane Doe.  Dyer and grant for the ERC and administrative segregation, Matthewes, Durbin, Key, Tice, and Beatty for the improper Taser use.  No factors such as might conceivably authorize the use of force were present as to Jane Doe.

315.    Nor did any of Defendants Matthewes, Durbin, Key, Tice, and Beatty reflect even an awareness that the Taser use was prohibited absent special circumstances not presented by Jane Doe.

316.    Each of the Defendants Matthewes, Durbin, Key, Tice, and Beatty was informed of, and approved, that a Taser was used against Jane Doe while she was already restrained, reflecting their deliberate indifference or explicit authorization for the practice of Taser use against a restrained detainee.  Each had approved such Taser use prior to Jane Doe, and their deliberate indifference or explicit authorization to the practice enabled Jane Doe to be Tased.

317.    Defendants Dyer, Grant, Matthewes, Durbin, Key, Tice, and Beatty are, and have been, deliberately indifferent to the gross violations of a detainee's rights, as they each were to the rights of violations as to Jane Doe.

318.    Jane Doe is entitled to actual damages, and punitive damages, against each of Defendants Dyer, Grant, Matthewes, Durbin, Key, Tice, and Beatty for supervisor liability under 42 U.S.C. § 1983.

**For a Seventh Cause of Action:**
**Gross Negligence under state law**
(Against Defendant Sheriff in his official capacity)

319.    Allegations above, other than allegations as to actual malice and intent to harm, are incorporated into this cause of action as if fully stated.  In this cause of action the Sheriff is sued in his official capacity, responsible for the conduct of his deputies.

320.    The actions of each of the deputies named individually as to Jane Doe constitute gross negligence on behalf of the Sheriff.

321.    Minimum state jail standards, and jail policies, constitute standards in which Jane Doe has a Due Process interest.  Each violation of Jane Doe's Due Process or other rights under state minimum jail standards and jail policies constitute an "occurrence" of gross negligence by the Sheriff.

322.    Dyer and Farmer each committed an occurrence of gross negligence in (a) impeding Jane Doe's right to make "at least two" telephone calls during intake including a call to her lawyer, (b) failing to report Fickett's assault of Jane Doe, (c) participating in the spoliation to delete evidence of another deputy's assault on a detainee, (d) failing to report an assault committed by another deputy in his or her presence, (e) using without Due Process administrative segregation against Jane Doe, (f) using without Due Process the ERC against Jane

Doe, and (g) in retaliating against Jane Doe based on either the charge against her or for demanding her rights, or both. Farmer and Dyer together participated in 14 "occurrences" of gross negligence, chargeable to the Sheriff.

323.    Andrew Grant committed two occurrences of gross negligence in reviewing and approving the actions of Dyer and Farmer.

324.    Fickett committed occurrence of gross negligence in (a) impeding Jane Doe's right to make "at least two" telephone calls during intake including a call to her lawyer, (b) assaulting Jane Doe, (c) participating in the spoliation to delete evidence of her assault on a detainee, (d) failing to report her assault on Jane Doe, (e) using without Due Process administrative segregation against Jane Doe, (f) using without Due Process the ERC against Jane Doe, (g) using without Due Process, and violating state minimum jail standards and jail policy to use the Taser against Jane Doe, (h) improperly strip searching Jane Doe without Due Process and without justification, (i) sexual degradations of Jane Doe, deliberately positioning her in full view and hearing of male detainees and male deputies, (j) removing Jane Doe's bra while giving her a male's one-piece uniform rather than a two-piece uniform so Jane Doe would be compelled to expose herself before male detainees, and (k) retaliating against Jane Doe based on either the charge against her or for demanding her rights, or both. Fickett participated in 11 "occurrences" of gross negligence, chargeable to the Sheriff.

325.    Each of deputies Walters, McLauchlan and Calvert committed an occurrence of gross negligence in (a) impeding Jane Doe's right to make "at least two" telephone calls during intake including a call to her lawyer, (b) failing to report Fickett's assault of Jane Doe, (c) participating in spoliation to delete evidence of Fickett's assault on Jane Doe, (d) failing to report Fickett's assault on Jane Doe, (e) using without Due Process administrative segregation against

Jane Doe, (f) using without Due Process the ERC against Jane Doe, (g) using without Due Process, and violating state minimum jail standards and jail policy to use the Taser against Jane Doe, (h) sexual degradations of Jane Doe, deliberately positioning her in full view and hearing of male detainees and male deputies, (i) removing Jane Doe's bra while giving her a male's one-piece uniform rather than a two-piece uniform so Jane Doe would be compelled to expose herself before male detainees, and (j) retaliating against Jane Doe based on either the charge against her or for demanding her rights, or both.  Each of deputies Walters, McLauchlan, and Calvert participated in 10 "occurrences" of gross negligence, constituting 30 such occurrences chargeable to the Sheriff.

326.     Deputies Matthewes, Durbin, Key, Tice, and Beatty each committed an occurrences of gross negligence in reviewing and approving the actions of Fickett in using a Taser against Jane Doe, for five occurrences of gross negligence chargeable to the Sheriff.

327.     Jane Doe is entitled to damages against the Sheriff for each of the 62 separate occurrence of gross negligence by his deputies as to Jane Doe.

**For an, Eighth Cause of Action: Declaratory Relief**

328.     Allegations above are incorporated into this cause of action as if fully stated.

329.     Pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 1986, the court should declare that Jane Doe's rights under the First, Sixth, and Fourteenth Amendments to the United States Constitution were infringed by the conduct alleged in this Complaint.

330.     Jane Doe is entitled to declaratory relief as requested above.

**For a Ninth Cause of Action:**
**Defamation**
(Against Defendant Sheriff in his official capacity)

331.      Allegations above are incorporated into this cause of action as if fully stated.  In

this cause of action the Sheriff is sued in his official capacity, responsible for the conduct of his deputies.

332.    This cause of action presumes that Deputies Dyer, Fickett and Patrice Washington acted in their respective official capacities and within the course and scope of their respective employment in disseminating false information about Jane Doe, without specifically intending to harm Jane Doe.

333.    Defendant Dyer published false information about Jane Doe, claiming that Jane Doe's mother had caused her arrest because Jane Doe was abusing her mother.  Defendant Dyer knew the information was false when published.

334.    Defendant Fickett published false information about Jane Doe, in writing, claiming that Jane Doe was "under the influence of alcohol" and in a "highly intoxicated state," "swatted" at Deputy Walters and "kicked Opr. Walters in his right shin," none of which is reflected in the objective record. Deputy Fickett knew these statements were false when published.

335.    Deputy Dyer's publication was oral, and was to other deputies in the jail, other detainees, and to Jane Doe.  Dyer related the false information to Jane Doe in the first 34 minutes of Jane Doe's incarceration, and it was used as part of the taunting against her during the more than two hours she was in administrative segregation by the SOG operators and the 1A staff in administrative segregation, particularly by Patrice Washington in 1A.

336.    The false accusation by Deputy Dyer, then Washington, inherently accused Jane Doe of a crime, and is defamatory *per se* and actionable *per se*.

337.    Fickett's unsupported and false accusations accused Jane Doe of a crime, and were defamatory *per se* and actionable *per se*.

338.    Defamatory statements by Deputies Dyer and Washington falsely ascribed to Jane Doe (a) that malice existed between Jane Doe and her mother, (b) that Jane Doe was abusing her mother, and (c) that Jane Doe's mother had accused Jane Doe of abusing her, a felony in South Carolina.

339.    In this cause of action, it is presumed that Deputies Dyer, Washington and Fickett made false statements not with the intention to harm Jane Doe but with knowledge that the statements were false, or in reckless disregard of whether the statements were false.  The statements were made not with actual malice (in the form of ill will) towards Jane Doe but with Constitutional malice (in the form of knowledge of falsity or reckless disregard of falsity).

340.    For about three weeks after Jane Doe was finally able to leave the jail, starting the day after she left the jail, her mother was hospitalized at MUSC.

341.    Jane Doe was obligated to report to MUSC the false statements by Deputies Dyer and Washington about Jane Doe abusing her mother.  For a number of days Jane Doe suffered special damage from the Deputies Dyer and Washington's defamation in the form of MUSC medical providers prohibiting her daughter from having access to her until they could verify that there was no evidence that Jane Doe's mother was being abused.

342.    The false information spread by Deputies Dyer and Washington deprived Jane Doe of being able to provide care and comfort of her daughter.  Deputy Fickett's false statements resulted in excessive force being applied against Jane Doe.

343.    Once MUSC checked Jane Doe thoroughly for signs of abuse and could find none, MUSC permitted the daughter access to Jane Doe.

344.    The defamatory statements by Deputies Fickett, Dyer and Washington each tended to degrade Jane Doe, that is, "to reduce [her] character or reputation in the estimation of

his friends or acquaintances, or the public, or to disgrace [her], or to render [her] odious, contemptible, or ridiculous...." *Lesesne v. Willingham,* 83 F.Supp. 918, 921 (E.D.S.C.1949).

345.    Each of Defendants Dyer, Washington and Fickett were at fault in publishing untruthful statements about Jane Doe.  Their publication was during their employment as a deputy.  The Sheriff is responsible for their defamatory conduct.

346.    Jane Doe is entitled to damages against the Sheriff for the intentional tort of defamation as a result of the defamatory publications by Defendants Dyer, Washington and Fickett, and punitive damages to the extent provided by law.

### For a Tenth Cause of Action:
### Defamation
(Against Dyer, Washington and Fickett individually)

347.    Allegations above are incorporated into this cause of action as if fully stated, other than the allegations that Dyer, Washington and Fickett acted within the course and scope of their respective employment.

348.    This cause of action presumes that Dyer, Washington and Fickett, although each was a deputy, acted outside the course and scope of their employment, or with actual malice in the form of ill will towards Jane Doe, in disseminating false information about Jane Doe.  In this cause of action Defendants Dyer, Washington and Fickett are each outside the Tort Claims Act and are sued individually.

349.    In this cause of action it is presumed that Dyer, Washington and Fickett made false statements with the intention to harm Jane Doe, or with knowledge that the statements were false, or in reckless disregard of whether the statements were false.  The statements were made with actual malice (in the form of ill will) towards Jane Doe, and to retaliate against Jane Doe.

350.    Jane Doe suffered special damages from the Dyer and Washington's defamation as alleged above.

351.    Dyer, Washington and Fickett were each at fault in publishing untruthful statements about Jane Doe.  Assuming their publication was outside their employment as a deputy, Jane Doe is entitled to actual and punitive damages against each of Dyer, Washington and Fickett, jointly and severally, for defamation.

**For an Eleventh Cause of Action:**
**Defamation**
(Against Defendants Senn Legal LLC, Sandra J. Senn, and any other
Defendant on whose behalf Sandra J. Senn acted under color of state law)

352.    Allegations above are incorporated into this cause of action as if fully stated.

353.    This cause of action presumes that Sandra J. Senn acted on behalf of only herself and Senn Legal LLC in defaming Jane Doe.  This claim will be amended to the extent Sandra J. Senn claims, and a client agrees, that she took her tortious actions not for herself but in a representative capacity for one or more clients.

354.    False information about Jane Doe was published by the Senn Defendants to non-privileged third parties.

355.    Those false statements were defamatory of Jane Doe.

356.    The Senn Defendants acted with actual malice to harm Jane Doe, and knew the statements were false when made.  Alternatively, she acted with reckless disregard of the truth of the statements about Jane Doe.

357.    The statements were defamatory *per se* and actionable *per se*.  Jane Doe suffered harm from the statements, as alleged above in connection with the Senn Defendant statements.

358.    Since September 2, 2014, the Senn Defendants have been engaged in an admitted effort to intimidate Jane Doe, in cooperation with the City of North Charleston and its agents and employees.

359.    By their own account, the efforts put together by the Senn Defendants to intimidate Jane Doe have been "unable to shake" her from pursuing her claims.

360.    Jane Doe is entitled to actual and punitive damages, jointly and severally, against the Senn Defendants.

**Demand for Jury Trial**

361.    Plaintiff on behalf of Jane Doe demands a trial by jury.

**Relief Sought**

362.    South Carolina statutes make two provisions for damages from claims against state officials, depending on the nature of the claim.  These claims are brought within the authority of each of those provisions, and apply to the State Defendants.

363.    For certain acts of gross negligence, S.C. Code § 15-78-120 provides for damage limits of $300,000 and $600,000 per "occurrence" from actions other than medical or dental negligence.  Some actions alleged in this Complaint allege gross negligence, and multiple occurrences of gross negligence by the Defendants.  This provision of South Carolina law applies to the individual Defendants and to the Sheriff through the conduct of the individual Defendants who acted under color of state law.

364.    For violations of 42 U.S.C. § 1983, also alleged in this Complaint against certain individual Defendants who operated under color of state law, S.C. Code § 1-11-460 authorizes the South Carolina Budget and Control Board to pay judgments for one employee of between $1 million and $5 million, subject to a maximum of $20 million in excess of $5 million in one fiscal

year.  This Complaint alleges violations of 42 U.S.C. § 1983 against various individual deputies and the Sheriff individually.  That provision of South Carolina law applies to the claims against each of the individual Defendants.

365.    S.C. Code § 15-78-90 authorizes the Budget and Control Board, or the political subdivision where it has not purchased insurance from the Budge and Control Board, to "compromise any claim."  This provision of South Carolina law applies to these Defendants, and includes authority to compromise a claim that the Defendants acted so as to violate 42 U.S.C. § 1983 in depriving Jane Doe of her civil rights.  That provision of South Carolina law applies to each of the individual defendants and to the Sheriff individually.

366.    Upon information and belief, each of the Defendants in this action is covered by a tort liability policy issued by the South Carolina Insurance Reserve Fund.  Alternatively, or in addition, the persons sued individually in this action are protected by the support provided by South Carolina through S.C. Code § 1-11-460, and the South Carolina Budget and Control Board has express authority to compromise the claims, including the civil rights claims.

367.    Under the Supremacy Clause of the United States Constitution, no state law can limit damage claims for any violation of 42 U.S.C. § 1983.  The provisions of S.C. Code § 1-11-460 are not limitations on damage awards under 42 U.S.C. § 1983, but an assurance by the State that each person found liable in his or her individual capacity, other than the Senn defendants, will be supported by the State fisc up to $5 million, subject to a maximum of $20 million in excess of $5 million in one fiscal year.  The Supremacy Clause applies to each individual Defendant acting under color of state law.

368.    Beyond that $25 million limitation on the contribution the State will make towards any judgment under 42 U.S.C. § 1983, South Carolina law apparently leaves the

individual Defendants in this action to fend for himself or herself.  This provision of South Carolina law applies to each of these Defendants other than the Senn Defendants.

369.    Wherefore, Plaintiff requests that this Court:

a.   Enjoin Defendant Sheriff from failing to have adequate training for his deputies to understand and protect detainee rights; from ceasing its custom or policy for its officers to assault detainees; from failing to bar excessive force without proper Due Process protections; from failing to prohibit Taser use on persons already restrained absent present danger; from failing to expend sums sufficient to have the proper training and resources for its personnel to effectively protect civil rights; and from operating the jail in a manner which infringes the federally protected rights of Jane Doe and other detainees.

b.   Award actual and punitive damages, individually, against Defendants Cannon, Farmer, Dyer, Fickett, Walters, McLauchlan, Calvert, Cannon Farmer, Grant, Matthewes, Durbin, Key, Tice, Beatty and the Senn Defendants,

c.   Award actual damages and injunctive relief under the South Carolina Tort Claims Act against the Sheriff and to enjoin him from failing to develop and fund proper policies and training for his deputies to fully protect the interests of detainees.

d.   Award declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983, that inadequate protections were made available to Jane Doe which violated her First, Sixth and Fourteenth Amendment rights to the United States Constitution.

    e.   Award compensatory and punitive damages to Jane Doe as determined by the finder of fact against the individual Defendants under the claims under federal law.

    f.   Award compensatory damages to Jane Doe as determined by the finder of fact against all Defendants for the claims under state law.

    g.   Award Jane Doe's costs of suit and reasonable attorneys' fees under 42 U.S.C. § 1988.

370.   For such other and further relief as the Court deems just and proper.


Respectfully submitted.

  s/ Gregg Meyers

Gregg Meyers, SC Bar No. 9908
Jeff Anderson & Associates, PA
366 Jackson Street, Suite 100
Saint Paul, MN 55101
651-227-9990
Gregg@andersonadvocates.com

Attorney for Plaintiff